Earl **WATKINS, Herbert Lester Davis** and State Farm Mutual Automobile Insurance Co., etc., **Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 76–3608.

United States Court of Appeals, Fifth Circuit.

Feb. 7, 1979.

Skelton, Senior Judge, filed a dissenting opinion.

Henry L. Frohsin, Wayman G. Sherrer, Charles A. Perry, Asst. U. S. Attys., Birmingham, Ala., for defendant-appellant.

C. Lynwood Smith, Jr., Ralph W. Hornsby, Huntsville, Ala., for Earl Watkins.

Terrell Wynn, Birmingham, Ala., for Herbert Lester Davis.

L. Tennent Lee, III, Huntsville, Ala., for plaintiffs-appellees.

Before GOLDBERG, Circuit Judge, SKELTON *, Senior Judge, and FAY, Circuit Judge.

GOLDBERG, Circuit Judge:

This is an action under the Federal Tort Claims Act.

Airman James Richardson, though not a party to the suit, is the central character in this unhappy story. While on leave from his duty station in Turkey, Richardson, in the words of the trial judge, went "berserk." He was admitted to the Redstone Arsenal Psychiatric Clinic in Alabama for several days of treatment and observation. The psychiatrists diagnosed Richardson's disorder as "an acute and chronic situational reaction manifested by hysteria, anxiety, and depression."

About a month after Richardson's release from the Redstone Psychiatric Clinic, he returned to the Redstone Arsenal. This time he went to the Redstone Outpatient Clinic. There, Dr. Wald prescribed for him

---

* Senior Judge of United States Court of Claims, sitting by designation.

100 5 m. g. tablets of Valium.[1] Several days later, the plaintiffs-appellees, Earl Watkins and Lester Davis, were injured when Richardson drove his automobile into their car.

The plaintiffs-appellees brought this action against the government under the Federal Tort Claims Act. They alleged that the government was liable for their injuries because one of its employees, Dr. Wald, had caused the accident by negligently prescribing the Valium to Richardson.[2] The trial court held for the plaintiffs-appellees. It found (1) that Dr. Wald acted negligently in prescribing the Valium to Richardson and (2) that this negligence was a proximate cause of the plaintiffs-appellees' injuries. On appeal the government argues that the trial court erred in both these findings.

We begin our analysis by noting that in deciding the issues the government raises, we are bound by the standard of review set out in Rule 52 of the Federal Rules of Civil Procedure. It provides that "findings of fact shall not be set aside unless clearly erroneous." Fed.R.Civ.P. 52. With this standard in mind, we shall now consider the asserted errors raised by the government.

## I.

The trial judge found that Dr. Wald acted negligently in prescribing such a large amount of Valium to Richardson without taking an adequate history or checking for records with the Redstone Psychiatric Clinic. The government claims that there is insufficient evidence to support this finding of negligence.

We disagree. First, the record shows that Dr. Wald prescribed an excessive amount of Valium.[3] Dr. Wald, himself, testified that he did not generally write prescriptions for 100 tablets. The government theorized that the reason for the unusually large prescription may have been that Richardson was about to return to Turkey and would have been unable to receive treatment en route. A former flight surgeon, however, discounted the government's explanation testifying that the time in transit between air bases is never very long and there are generally medical facilities available at the stopping points. In any event, under the directed dosage, the prescription supplied Richardson with enough Valium for *fifty* days. We cannot believe that Richardson would spend over seven weeks in transit.

Second, the record shows that Dr. Wald prescribed this large amount of Valium on the basis of a very incomplete knowledge of Richardson's history and current condition. Since Dr. Wald did not remember treating Richardson, he could only testify to his standard procedures for taking a patient's history and obtaining his records.

Dr. Wald testified that under the procedure at Redstone Outpatient Clinic an examining doctor would only be furnished with records of a patient's prior visits to the outpatient clinic. He would not receive any records from the Redstone Psychiatric Clinic, nor would the patient's records be flagged to indicate that he had visited the psychiatric clinic. Thus, since Richardson's permanent medical records were at his duty station in Turkey and since he had not previously been to the Redstone Outpatient Clinic, we must assume that Dr. Wald was furnished with no records on Richardson.

From the prescription he gave, Dr. Wald concluded that Richardson had probably complained of insomnia or another condition indicating mild anxiety. Valium is an appropriate drug for treating these ail-

---

1. The prescribed dosage was half a Valium tablet four times a day. Dr. Wald also prescribed for Richardson penicillin and an antacid called Mylanta Liquid.

2. The Federal Tort Claims Act provides that the United States may be sued for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Govern-

ment while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). Here the government concedes that in prescribing the Valium, Dr. Wald was acting within the scope of his employment.

3. The propriety of the dosage, half a 5 m. g. tablet four times a day, is not in question.

ments. Dr. Wald stated that before prescribing Valium to a patient like Richardson—one he did not know and for whom he had no records—he would take a patient history, *but only as it related to the patient's present complaint.* He would then prescribe the Valium if, on the basis of the visit, the patient seemed to him to be mentally and emotionally stable.[4]

Dr. Wald testified that had he known that Richardson was suffering from depression and had recently been treated for psychiatric problems, he would certainly not have prescribed Valium. All the doctors who testified agreed that Valium should not be prescribed to such a patient since it would increase the patient's depression. Dr. Corley, who qualified as an expert in medical practices in both the military and the Huntington, Alabama area, indicated that the practice of prescribing a large amount of Valium to an unknown patient without asking the patient if he had a history of mental problems and without checking for records with a psychiatric clinic on the same military installation fell below the standard of care in the medical community. A doctor's treatment is negligent if it falls below that standard of care. *See, e. g., Parrish v. Spink,* 284 Ala. 263, 224 So.2d 621 (1969).

Dr. Wald did not as a general practice before prescribing Valium ask patients he did not know whether they had a history of mental problems. We cannot tell from Dr. Wald's testimony whether, in taking a "history relative to Richardson's present complaint," he asked Richardson if he had ever had any mental problems. The trial judge evidently assumed that Dr. Wald did not ask Richardson this question. If Dr. Wald did not, he was negligent in prescribing the Valium because he failed to take an adequate history. For the purposes of this opinion, we will assume that Dr. Wald did ask Richardson about his mental health. Even under this assumption, Dr. Wald was still negligent because he failed

to verify Richardson's answers by checking for records with the Redstone Psychiatric Clinic.

Given Dr. Wald's practices and Dr. Corley's testimony, there was sufficient evidence in the record for the trial judge to find that Dr. Wald acted negligently. We certainly cannot hold this finding clearly erroneous.

In deciding this case we express no opinion about whether Dr. Wald would have been negligent had he prescribed a smaller amount of Valium on the basis of the history he took and procedures he followed; nor do we decide whether Dr. Wald's large prescription would have been acceptable if he had taken an adequate history and checked the files at the Redstone Psychiatric Clinic. But it seems clear to us that by prescribing such a large amount of Valium to Richardson without even telephoning to the psychiatric clinic on the same base, Dr. Wald impermissibly increased the danger that Richardson would harm others. *A Fortiori* then, if Dr. Wald did not even question Richardson about his mental health, he certainly impermissibly increased this danger.

There was no obvious reason to prescribe so much Valium; little harm will be done, we think, and few costs incurred if military doctors can prescribe only smaller quantities, at least until they have access to some of the patient's records. Also, it is scarcely burdensome to check other clinics on the same installation for records which might indicate that a certain prescription would be unusually dangerous. The issue is not whether the army must establish centralized record keeping or even whether each installation must have centralized filing. The point is only that before prescribing a potentially dangerous amount of a drug, Dr. Wald should have taken the minimal precaution of inquiring of another clinic at the same facility whether the patient had the sort of history that would plainly preclude the prescription. This much, at least, is required.

4. Dr. Wald admitted, however, that people who are mentally ill do not consistently manifest symptoms of their illness.

## II.

The government makes two arguments concerning the trial judge's finding of proximate cause. First, the government argues that there is insufficient evidence in the record showing that Richardson actually ingested the Valium. And second, it argues that because Richardson had .16 m. g. of alcohol per 100 cubic centimeters of his blood, the trial judge erred in finding that Richardson was only mildly intoxicated and that his intoxication could not have accounted for his actions.

Contrary to what the government argues, we find sufficient evidence in the record that Richardson ingested the Valium. His wife testified that he was taking the Valium on the morning of the accident and that he was "high" on Valium when he left the house.

Furthermore, considerable circumstantial evidence supports such a finding. Richardson spent the afternoon of the day of the accident at the home of Margaret Croxton, his wife's aunt. Croxton testified that all during the afternoon Richardson sat with a bottle of liquor and a vial of Valium on the table in front of him. She stated that he made many trips to the bathroom and each time he took the Valium with him. She further stated that although she only saw Richardson take two small drinks of liquor, his behavior became more bizarre as the afternoon wore on. He seemed in a stupor and had difficulty speaking and moving. By the end of the afternoon, he was, according to Croxton, acting like a "zombie."

At trial several witnesses testified to Richardson's reckless driving right before the accident. According to their testimony, Richardson was sitting erect in the car and appeared to have deliberately aimed at several oncoming vehicles before hitting the plaintiffs-appellees' automobile. One of these witnesses testified that after the accident he approached Richardson's automobile and saw a partially empty bottle of small, round, yellow pills on the floor of the car. Valium tablets were shown to fit that description.

Although there was some evidence to the contrary,[5] we conclude that there was sufficient evidence in the record from which the trial judge could find that Richardson had ingested the Valium on the day of the accident. Once again, we cannot hold this finding clearly erroneous.

The government's second contention concerning proximate cause is that the trial judge erred in concluding that Richardson was only mildly intoxicated and that his intoxication alone could not explain the manner in which Richardson operated his automobile. The government notes that the .16 blood alcohol level in Richardson's blood raises a presumption of intoxication under Alabama law.[6] It claims that Richardson's intoxication was the sole cause of the accident and that the trial judge must have ignored the Alabama statutory presumption in finding otherwise. We disagree. The trial judge did not disregard the presumption. His finding that Richardson was mildly intoxicated is in accordance with the presumption. The Alabama statute

5. Laboratory tests taken after the accident showed that Richardson's stomach contents and urine were "negative to drugs tested." The records, however, do not indicate whether the lab specifically tested for Valium. Moreover, a doctor testified that such negative test results are not conclusive evidence on the absence of drugs.

6. Alabama Code provides,

Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving a vehicle while under the influence of intoxicating liquor, the amount of alcohol in the person's blood at the time of the chemical test or tests authorized by this chapter as shown by chemical analysis of the person's blood, urine, breath shall be admissible as evidence and give rise to the following presumptions: . . .

3. If there was at that time 0.10 percent or more by weight of alcohol in the person's blood, it shall be presumed that the person was under the influence of intoxicating liquor.

4. Percent by weight of alcohol in the blood shall be based upon milligram of alcohol per one hundred cubic centimeters of blood.

Ala.Code tit. 36, § 155(a) (Supp.1974).

merely raises a presumption of intoxication. If intoxication is found, nothing in the statute or Alabama case law requires the trial judge to find that the intoxication is the sole cause of any resulting harm.

Furthermore, there is evidence in the record which supports the trial judge's finding that Richardson's intoxication did not alone account for his behavior. Dr. Corley testified that a .16 m. g. blood alcohol level would constitute only *mild* intoxication and would only slow a person's reflexes in responding to emergency situations. Another doctor testified that Valium when taken with alcohol can seriously effect the brain, causing "failure of judgment." Given the evidence of synergistic effect of alcohol and Valium, the finding that Richardson did ingest the Valium, and his conduct in operating the automobile, we cannot hold clearly erroneous the judge's finding that Richardson's intoxication alone could not explain his actions.

Perhaps what the government is really arguing is that because Richardson's intoxication contributed in causing the accident, Dr. Wald's negligence in prescribing the Valium cannot be a proximate cause of the plaintiffs-appellees' injuries. However, Alabama follows the general tort rule that there can be more than one proximate cause of an injury. *Alabama Power Co. v. Taylor,* 293 Ala. 484, 306 So.2d 236, 248 (1975); *Lawson v. General Telephone Co.,* 289 Ala. 283, 267 So.2d 132, 138 (1972).

The proximate cause rule in Alabama is that a person is responsible for all the reasonably foreseeable consequences of his negligent act. *E. g., Vines v. Plantation Motor Lodge,* 336 So.2d 1338 (Ala.1976). Obviously, a foreseeable consequence of prescribing Valium to a serviceman without checking to see if he has a history of psychiatric problems is that the serviceman will in fact have psychiatric problems. It is also foreseeable that a serviceman suffering from depression will drink. And finally, it is foreseeable that a person with mental problems, who has ingested Valium and alcohol, will cause injury to others. Thus, Dr. Wald's negligence in prescribing the Valium

must be considered a proximate cause of the plaintiffs-appellees' injuries.

For the reasons stated, we uphold the disputed findings of fact of the trial judge and his conclusion on proximate cause. The trial court's findings are brigaded by a sturdy buckler and shield which have been our Marquis of Queensberry rule for more than twenty years. *See Connally v. Transcon Lines,* 583 F.2d 199 (5th Cir. 1978); *Lumbermens Mutual Casualty Co. v. Klotz,* 251 F.2d 499 (5th Cir. 1958). The protective armor of Rule 52 of the Federal Rules of Civil Procedure here parries the government's epee. The trial judge's findings are fact-founded, logically deducible, and survive the government's onslaught. The judgment of the district court is therefore affirmed.

AFFIRMED.

SKELTON, Senior Judge, dissenting:

I respectfully dissent. I do not agree with the trial judge or the majority that Dr. Wald was negligent in prescribing Valium to serviceman Richardson under the circumstances in this case. In my opinion, such finding by the trial judge was clearly erroneous and should not be approved. Furthermore, the conclusion of the trial judge and of the majority that the prescribing of Valium to Richardson by Dr. Wald was the proximate cause of the automobile collision two days later in which the plaintiffs were injured should not be upheld because it was also plainly erroneous. There were many intervening causes for which Dr. Wald was not responsible, any one of which could have caused the collision. Also, Richardson's drunkenness in combination with his attempted suicide was the sole proximate cause of the collision.

This case presents a hybrid mixture of facts and legal issues not found in the usual suit for damages for personal injuries. Although this suit is brought against the Government under the Federal Tort Claims Act, the case is actually against Dr. Wald for alleged medical malpractice, though he is not a party to the suit. Richardson, the

principal actor in the case, is not a party to the suit and did not testify at the trial. Furthermore, the plaintiffs were strangers to Dr. Wald, were not his patients and never had been, and he owed them no professional or medical duty. Finally, on these bizarre facts, liability is sought to be imposed on the Government on the theory of agency.

### I. The Negligence Issue

Dr. Wald was a doctor in an out-patient clinic of a military hospital. As such, his practice was much like that of a country doctor or of a doctor in a suburban area whose patients are treated in a doctor's private office. It is a matter of common knowledge, as well as by proof in this case, that a doctor in an out-patient clinic treats only minor ailments, such as stomachache, backache, headache, and other minor aches and pains as well as minor cuts, bruises, burns and infections. No surgery is performed and no elaborate or general physical or mental examinations are made of patients like those usually made in regular clinics and general hospitals. An out-patient clinic at a military hospital is a place where servicemen, their wives and children can go for quick treatment for minor ailments without having to go through the elaborate and arduous examinations they would have to endure in a regular or general hospital or clinic. Consequently, a doctor in such an out-patient clinic, as Dr. Wald in the instant case, makes a rather casual examination of a patient which is usually limited to blood pressure, temperature, urine (if indicated by the complaint) and to the particular ailment or complaint of the patient. Ordinarily, very little general medical history of the patient is taken, as both the doctor and the patient are only concerned with the immediate ailment or complaint that caused the patient to come to the clinic in the first place. The record shows that such was the practice and custom of Dr. Wald and other doctors in the out-patient clinic involved in this case. Dr. Wald testified about the procedure for the admission, questioning, examination and treatment of patients at the out-patient clinic as follows:

"Q. Approximately how many patients a day would you see under normal conditions, and by 'normal conditions' I mean during your 4½ day week, per day, as a general medical officer at Redstone Arsenal?

A. I'd say an average of 25. That's a rough estimate.

Q. Where would you see these patients?

A. I would see them in the out-patient clinic which was on the first floor of the hospital.

Q. What sort of illnesses or treatment modes would you undertake for the patients who presented themselves to you normally? Did you do any operations? By that I mean surgery.

A. No.

Q. What were your typical duties?

A. *I would have cared for out-patients whose problems were basically minor in nature, that didn't necessitate hospitalization.* If they did necessitate hospitalization I might have cared for them, or if it were a more complicated problem that required a specialist, I would have referred the patient to a specialist.

Q. With regard to the following questions that I am going to ask you, I will ask you in terms of your standard operating procedure at Redstone Arsenal as you knew it.

When a patient would present himself in the out-patient clinic, what were the procedures as far as taking a history?

A. Do you mean the procedure on the part of the physician or on the part of the whole staff?

Q. Let's take first of all the physician.

A. By the time that the physician saw the patient, the patient's basic complaint was already noted and listed. *Generally, in the out-patient clinic, it was not a clinic for general examinations. The patient's primary problem was what was looked into at that point.*

*The patient was asked about symptoms and signs relating to his present complaint.*

Q. Who would record the presented complaint prior to the patient being presented to you?

A. There were a number of specially trained screening personnel, either corps men or Army nurses.

Q. Who would initially see a patient as they came into the out-patient clinic?

A. I think the first person to see the patient was the clerk at the front desk.

Q. What were his duties?

A. As far as I know, his duties were to list the patient's name on a roster of all patients seen that day, and to make up a chart for each patient.

Q. And then where would the patient proceed?

A. From the front desk, the patient went to one of the screening rooms where he was seen by the corps man or the nurse to determine the nature of his complaint.

Q. Would certain procedures, medical procedures, be affected at that time, such as blood pressure and temperature?

A. Yes, patients vital signs were taken at that time.

Q. Would this be recorded by the nurse?

A. Yes.

Q. If there were any observations, remarkable observations, to have been made at that point in time by the corps man or the nurse, would they have had authority to make some entry on the complaint form before that form was presented to you?

A. Yes. If there was something outstanding about the patient's complaint, they, as a practice, wrote it on the chart. The patients did not actually see the chart from the time they entered the hospital, and in addition, they would have notified the physician if there was something else.

Q. *If the patient had been a prior patient at the out-patient clinic, would the clerk who initially prepared the form have checked your indexes as a standard practice?*

A. *I think the clerk at the front desk routinely asked all patients if they had been seen at our clinic prior to this time, and if they had, the clerk would have gotten the previous record.*

\* \* \* \* \* \*

Q. When the patient had been through the initial phases, and the patient was then presented to you as the physician, what would you then accomplish? What procedures would you effect?

A. I would read the complaint and the vital signs that were previously recorded. *I would* speak to the patient, *take a history that was relevant to his presenting complaint, and then I would examine him as much as was needed, as was indicated by his presenting complaint,* and then I would treat him or refer him if that were indicated.

Q. If a patient presented psychological problems or psychiatric problems, what was the standard operating procedure during your period at Redstone Arsenal Army Hospital for that type of complaint or illness?

A. If there was any indication that the patient had a psychiatric disorder of any kind, the routine procedure was to call the psychiatric clinic which was, as I mentioned, [in] another building, and they were very well staffed, and they saw patients very promptly. They would have seen the patient instead of my seeing him.

\* \* \* \* \* \*

Q. As I understand the standard operating procedure, *the clerk would ask the patient if he had ever been hospitalized there before; is that* correct?

A. *Either hospitalized or seen as an out-patient, if he had ever been seen there at all.*

Q. If the patient had answered no, then the prior records would not have been secured; is that right?

A. That is correct.

\* \* \* \* \* \*

Q. As far as patients' medical records at the Redstone Army facility, was there any type of flag or notation to treating physicians that there were other psychiatric records available should they need to be seen?

A. No, there was not.

Q. *So, if a patient would come in and would not reveal that he had been treated psychiatrically, there would be no way for the medical officer on duty in the out-patient clinic to know that, would there?*

A. *That's correct.*

\*    \*    \*    \*    \*    \*

Q. There was no procedure, as you know it, for a routine check to be made of the patient's prior records other than simply asking him if he had been at the hospital?

A. I think that's correct." (Emphasis supplied).

Notwithstanding the foregoing testimony, the trial judge found that Dr. Wald was negligent in the following particulars, which finding has been approved by the majority:

(1) In failing to take an adequate history that would have shown that Richardson had been a patient in the psychiatric clinic;

(2) In failing to inquire as to records of admission to the psychiatric clinic and the diagnosis shown therein;

(3) In prescribing Valium for Richardson; and

(4) In delivering an excessive quantity of Valium to Richardson.

The majority has added two more findings of fact not made by the trial judge, namely that Dr. Wald was negligent:

(1) In not asking Richardson if he ever had any mental problems; and

(2) If this question was asked of him, Dr. Wald was negligent in not verifying his answer by checking for records in the psychiatric clinic.

I will discuss these findings of negligence as follows.

The foregoing testimony of Dr. Wald as to the procedure followed by him and other doctors and employees at the out-patient clinic in admitting, examining and treating a patient shows that Richardson was asked if he "had been seen at the clinic prior to this time" and his response was negative. Again he was asked if he "had ever been hospitalized or seen as an out-patient" or if he "had been seen there at all" and his response was again negative. His negative responses to these questions, while not evidenced by his direct statements, are shown by the fact that if he had said "yes" his records would have been produced and examined. This did not occur. Therefore, it must be assumed that he represented to Dr. Wald and the other employees that he had never been treated anywhere in the institution. Consequently, in this state of the record, the proof shows that an adequate history according to out-patient clinic standards was taken. The plaintiffs did not disprove it by producing Richardson as a witness, or otherwise, yet the burden of showing negligence was upon them.

When the questioning of Richardson failed to reveal that he had ever been a patient at the *clinic or hospital,* and in fact showed that he had not been, it appears that Richardson either deliberately misrepresented the facts, or else misunderstood the questions. In either event, Dr. Wald was justified in believing that Richardson had never been a patient in the clinic or hospital. Under these circumstances the medical history was adequate and there was no point or necessity in Dr. Wald's checking records at the psychiatric clinic or any other department of the institution, or in Turkey or anywhere else. He relied on the representations of Richardson as to whether he had ever been treated in the clinic or hospital. This is standard and customary practice of doctors in any clinic or hospital. Otherwise a doctor would spend most of his time looking for records and checking on the statements of a patient as to whether he had or had not been treated at a hospital or clinic. Dr. Wald testified in this regard as follows:

"Q. But you have to rely on the individual to tell you that he has been treated, do you not?

A. That's right."

As to the findings by the majority that Dr. Wald was negligent in not asking Richardson if he ever had any mental problems, or if he did ask him this question, he was

negligent in not verifying his answer by checking the records at the psychiatric clinic, no such findings were made by the trial judge unless it could be said that they were included in his finding as to a failure to take an adequate history. If he made no such findings, they cannot be made here. In any event, as a practical matter, it would have been inappropriate, irregular, and somewhat out of place for Dr. Wald to have asked Richardson, who was complaining of a common strep throat and a simple stomach ailment, if he had ever had any mental trouble.

Richardson was also complaining of mild anxiety that could have been caused by the stomach ailment. Dr. Wald testified in this regard as follows:

"Q. Let met get you to describe in a little bit more detail the history which you would have taken with regard to the condition for which you prescribed the Valium.

A. Well, we are assuming, of course, that the condition for which I gave the Valium was a minor anxiety type of state.

From the prescription here, the patient also was given Mylanta. *It appears that he had what I considered to be a functional type of upper gastrointestinal upset, gastritis and upset stomach, and these things are very frequently anxiety-related.*

\*    \*    \*    \*    \*    \*

Q. *Or it could have been an adjunct to the treatment of a upper GI gastrointestinal complaint that he had?*

A. Of a functional nature; I'd say that's possible." (Emphasis supplied).

Richardson appeared normal to Dr. Wald, and there was nothing in his appearance or behavior to indicate that he had ever had any mental trouble. There was nothing in his examination or in his answers to questions that could possibly have put Dr. Wald on notice or even on inquiry as to mental problems. It is undisputed that Dr. Wald had no knowledge or information that Richardson had ever had mental trouble. Under all these facts, Dr. Wald was not negligent in failing to ask Richardson if he had ever had any mental trouble.

Accordingly, the findings of the trial judge that Dr. Wald was negligent in failing to take an adequate medical history of Richardson, and in failing to inquire as to records of his admission to the psychiatric clinic and the diagnosis therein, are not supported by a preponderance of the evidence on the record as a whole, and such findings are plainly erroneous and should not be approved.

This brings me to a discussion of the findings of the trial judge that Dr. Wald was negligent in prescribing Valium for Richardson and in delivering an excessive quantity of Valium to him.

Whether or not Dr. Wald was negligent in prescribing Valium for Richardson depends on the situation existing at the time as it appeared to Dr. Wald. That situation was simply this. Richardson appeared at the out-patient clinic complaining of a strep throat, an upset stomach and mild anxiety. In answers to questions of Dr. Wald and other employees of the clinic, Richardson never revealed that he had ever been an in-patient or an out-patient of the psychiatric ward of the hospital and never indicated that he had ever had any mental trouble. In fact, as discussed above, his answers were such that Dr. Wald and others in the out-patient clinic were led to believe that he had never been a patient in the out-patient clinic or in any other part of the hospital, which, of course, would include the psychiatric ward.

The record shows that at this point Dr. Wald questioned him about his presenting complaints and from his answers decided upon the medication to be prescribed. For treatment of the strep throat infection, he prescribed a medication called Pen Vee Kee of 250 milligram tablets, which is Penicillin, to be taken by mouth at the rate of one tablet 4 times a day for 10 days. This was a treatment for a bacterial infection and the dosage was for a period of 10 days. There is no complaint that Dr. Wald was negligent in prescribing this treatment and medication.

The second medication prescribed by Dr. Wald was called Mylanta liquid, which was a liquid antacid for treatment of an upper gastrointestinal tract upset or stomach distress of which Richardson was complaining. There is no complaint that Dr. Wald was negligent in prescribing this treatment and medication.

Richardson was also complaining of mild anxiety in connection with his other ailments, which Dr. Wald testified could have been caused by his stomach disorder, as discussed above, which anxiety caused him to have trouble sleeping at night. For this anxiety, Dr. Wald prescribed Valium, which is a proper and common drug prescribed for mild anxiety complaints, as it is a tranquilizer and relaxes the patient.

The record shows that Dr. Wald examined and treated about 25 patients each day in the out-patient clinic and that he prescribed Valium for from three to five of such patients. The evidence also shows that Valium is the most commonly prescribed drug in the pharmacopoeia. Under all of these circumstances, there was nothing unusual or extraordinary about Dr. Wald's prescribing Valium for Richardson. The dosage he prescribed for this medication was very mild, namely ½ of a 5 milligram tablet by mouth 4 times a day. This amounted to 2½ milligrams 4 times a day. Such dosage was shown by the evidence to be very small and too little to have any muscle relaxing effect, and was customarily prescribed for a very minor anxiety type of situation. Dr. Phillips, an expert in military medicine, testified that the dosage of Valium that Dr. Wald prescribed for Richardson was less than that given in most cases. He said:

"The half tablet of 5 mg. four times a day is a little bit like shoveling the ocean dry with a tablespoon or something like that."

Under these facts and circumstances, Dr. Wald was justified in prescribing Valium for Richardson. The dosage that he prescribed was very small. The drug was a common one and frequently prescribed. In fact, the evidence shows that Richardson's wife was taking Valium under a prescription she had obtained for herself at the time Dr. Wald prescribed Valium for her husband.

The preponderance of the evidence on the record as a whole does not support the finding of the trial judge that Dr. Wald was negligent in prescribing Valium for Richardson. Accordingly, the finding is clearly erroneous and should be set aside.

This leaves only a discussion of the finding of the trial judge that Dr. Wald was negligent in prescribing an excessive quantity of Valium (100 tablets of 5 mg. each) for Richardson. Whether or not he was negligent in prescribing this number of pills depends on the situation confronting Dr. Wald at the time as viewed from his standpoint. Richardson told Dr. Wald that he was in the United States Air Force and stationed in Turkey and was in transit at the time and would not be in proximity to another medical facility for quite a while. Richardson appeared to be reliable and there was nothing in his behavior that indicated that he had any mental problems. Of course, Dr. Wald had no knowledge of his previous psychiatric trouble. Under these circumstances, Dr. Wald accommodated the serviceman and prescribed "enough medicine to tide him over." These facts show that Dr. Wald's actions were reasonable and free from negligence when he prescribed the 100 pills of Valium.

Dr. Wald testified that the total amount or number of Valium pills prescribed varied from patient to patient, depending on his complaint and his condition. When questioned about this, he testified as follows:

"Q. What is the normal dosage of Valium if you had not been presented with some story or something by this individual that he was going back to Turkey or something? What would be the normal dosage?

A. You mean the normal amount per day, or the normal total number—

Q. The normal total.

A. It depends on the situation. If the individual presents with severe back strain or something like that and has to

be in bed and needs to take a great deal of this, it's not unreasonable to give an individual 15 milligrams of this four times a day.

For severe back strain, that would mean three pills four a time a day, which is twelve pills a day.

If you plan not to see this individual for five or six days, that's five times twelve, which is sixty or more.

*If an individual is presented with anxiety and you feel that the individual will benefit by one pill or two pills four times a day, which is a reasonable treatment for significant anxiety state, that means up to two pills four times a day, which means eight pills a day*, and if you plan not to see him for a week, that's seven times eight, *which is fifty-six*.

If you realistically feel that the individual needs the medicine and you plan to treat him that way, and you plan not to see him every couple of days you have to give him the medicine." (Emphasis supplied).

From this testimony, and the lack of any conflicting evidence, we may assume that it would be normal to prescribe 56 Valium pills to anyone, such as Richardson, who was complaining of an anxiety state. That means that in the instant case Dr. Wald prescribed 44 pills more than usually prescribed for a person with Richardson's complaint. The reason for this excess was the transit situation of Richardson, as explained above by Dr. Wald. Under the circumstances, the extra 44 pills appeared to Dr. Wald to be appropriate and proper.

While, in my opinion, Dr. Wald was not negligent in prescribing the extra 44 pills, the question becomes academic and of no significance in view of the fact that there is no evidence that shows that the extra 44 pills had any causal connection with the automobile collision in this case. The evidence indicates that the collision would have occurred even if Dr. Wald had only prescribed 10, 20, 30, 40 or even 56 pills. The extra pills had nothing to do with it.

The dosage prescribed for the Valium was the important thing, not the total number of pills. The dosage of ½ a pill by mouth 4 times a day was very low. All of the medical testimony shows that this was true and that a larger dosage is usually prescribed. No negligence can be attributed to Dr. Wald because of this small dosage. At the time this dosage was prescribed, Dr. Wald warned Richardson not to drink alcohol while taking the Valium. He had a right to expect Richardson to follow his instructions, both as to the dosage as well as to the drinking of alcohol, and if he did not do so, Dr. Wald would not be responsible for anything resulting therefrom. In this regard, the following statement appears in 70 C.J.S. Physicians and Surgeons § 51b, p. 974:

"b. Failure to Follow Instructions

Failure of a patient to cooperate with his physician and to follow all reasonable and proper instructions, thereby contributing to the injury claimed to have arisen from the physician's negligence or malpractice, will bar recovery therefor.

It is the duty of a patient to cooperate with his physician and conform to the necessary prescriptions and treatment, and follow all reasonable and proper instructions given, and a failure on the part of the patient in this respect which contributes to injury claimed to have arisen from the physician's negligence or malpractice will bar recovery therefor, even though his compliance is prevented by the pressure of pain or his refusal to carry out the instructions is due to his ignorance of the consequences of such failure."

Accordingly, as long as Richardson followed the prescribed dosage of the Valium and abstained from drinking alcohol, the extra Valium pills were of no consequence. If he did not follow such instructions, any resulting negligence was that of Richardson and not Dr. Wald's.

Therefore, the finding of the trial judge that Dr. Wald was negligent in prescribing an excessive quantity of Valium for Richardson is not supported by the evidence considered as a whole and is plainly erroneous and should be reversed.

Since Dr. Wald was not negligent in his examination and treatment of Richardson, nor in prescribing medicine for him, that should be the end of the case, as there can be no causation without negligence. Under these circumstances, there is no need to reach or decide the question of causation. However, I will discuss causation *infra*, since the trial judge and the majority have done so.

## II. *The Causation Issue*

The trial judge made the following finding on proximate cause:

"I find that the injuries and damages sustained by the plaintiffs in this case proximately resulted from the negligence of Dr. Wald acting within the line and scope of his office or employment in the Military Service of the United States in causing 100 five-milligram Valium tablets to be delivered to Richardson two days before the collision involved in this case."

The trial judge made the following conclusion of law:

"The court _ _ _ further concludes that the injuries and damages sustained by each plaintiff proximately resulted from the negligence to which the court has heretofore adverted."

Of course, if Dr. Wald was not negligent in prescribing the Valium, which I have shown in the preceding section of this opinion to be true, the above finding of fact of the trial judge that the injuries and damages proximately resulted from the alleged negligence of Dr. Wald is plainly erroneous. For the same reason, the above conclusion of law to the same effect is erroneous as a matter of law.

If it can be assumed *arguendo* that Dr. Wald was negligent in prescribing the Valium, the plaintiffs have wholly failed to prove that such negligence was the proximate cause of the injuries and damages in this case. This is shown by the following facts. No one actually saw Richardson ingest a single Valium tablet. His wife said he was "taking" Valium and was "high" on Valium on the morning of the accident, but she finally admitted on cross-examination

that she had not seen him take any Valium. Accordingly, her testimony that he was taking Valium and was high on it was a conclusion on her part, was not competent evidence, and was purely speculative. She was not a doctor and was not qualified to testify that by his conduct he was taking Valium and that he was high on Valium.

The only other persons who saw him on the day of the accident prior to the collision were his wife's aunt, Mrs. Croxton, and her daughter, Connie Gross, with whom he had spent the afternoon. Both testified that they did not see him take any Valium, although they observed he had a bottle of pills with him. They did not know if they were Valium or not. They also testified that he drank vodka, sloe gin, and Southern Comfort bourbon all afternoon.

Thus, we see that there is no proof that he took any Valium on the day of the accident, unless it was shown by the speculative and conclusionary testimony of his wife. But even her testimony, if deemed to be competent, does not show how much Valium he took that morning. As far as we know the amount may have been insignificant, if he took any at all. If he did ingest any of the drug, while he was with his wife, he was not drinking at the time. She so testified.

Furthermore, after the collision occurred, a blood test, a urine test, and a stomach test were performed on him and they showed that there was no Valium in his blood, urine or stomach. On the other hand, the blood test showed that he had a blood alcohol content of 0.16 mg. per one hundred cubic centimeters of blood. This was sufficient alcohol to prove under the Alabama law that he was intoxicated. The Alabama statute provided that if a person had more than 0.10 mg. of alcohol per one hundred cubic centimeters of blood, he was intoxicated. Also, the Alabama State Toxicologist who performed the blood test stated:

"*A person with the above percent of alcohol in his blood would be considered under the influence of intoxicating beverages and incapable of safely operating a*

*motor vehicle or conducting other tests requiring a similar degree of coordination."* (Emphasis supplied).

The most that the foregoing evidence showed was that the Valium prescribed by Dr. Wald "might have" caused the collision or "possibly could have caused it." This is not enough for a finding of probable proximate cause. The plaintiffs were required to prove in this medical malpractice case that the Valium *actually* caused the collision or *probably* did cause it. This, the plaintiffs wholly failed to do. Consequently, the finding of the trial judge that the prescription of the Valium by Dr. Wald was the proximate cause of the injuries and damages is not supported by the evidence on the record as a whole and is plainly erroneous.

But we do not need to stop here. The evidence shows that there were abnormal, efficient, and unforeseeable intervening probable proximate causes that broke the chain of causation of the alleged negligence of Dr. Wald, if any, in prescribing Valium, and which, in combination, became the sole proximate cause of the injuries and damages in this case. These causes, in combination, were that Richardson got drunk and while in a drunken state tried to commit suicide. These causes were not foreseeable by Dr. Wald and he was in no way responsible for them.

The foregoing evidence shows that prior to the accident, Richardson drank vodka, sloe gin, and Southern Comfort bourbon and became intoxicated to the point that he could hardly walk to his car when he left Mrs. Croxton's house. She telephoned his wife that he would never "make it home." There was no proof that he ingested any Valium while drinking this alcohol. He left Mrs. Croxton's house in his car, sitting erect, and proceeded down the highway. From the way he drove his car, it is clear that Richardson knowingly and deliberately tried to commit suicide. This is shown by the following events.

After leaving the Croxton house in his car, he forced a station wagon with six persons in it off the road. He then ran through a "red" traffic signal and proceeded in a northerly direction in a southbound (wrong) lane, forcing two automobiles off the road to avoid collisions. He drove his car 50 to 60 miles per hour straight toward them. He then headed straight for a pick-up truck, which avoided a collision by driving off a shoulder of the road. After missing the truck, he headed his car straight towards the oncoming car in which the plaintiffs were riding. The driver of that car tried to avoid a collision by cutting over into another lane, but Richardson was not about to let it escape, as he cut over, too, and deliberately and intentionally drove his car directly into it head-on. It is clear he knew what he was doing.

It is obvious that the trial judge ignored all of this evidence, including the lack of proof that Richardson had ingested Valium, the lack of evidence that he had drunk alcohol while taking Valium, the fact that he had drunk vodka, gin and bourbon all afternoon, the blood, urine and stomach tests after the collision that showed no Valium in his body, the statement of the trained, experienced and qualified state toxicologist to the effect that Richardson was drunk, and because of his drunkenness was incapable of safely operating a motor vehicle, his obviously drunken state, as shown by his conduct, and, finally, his deliberate attempts to commit suicide. All of this conclusive evidence of drunkenness and attempted suicide was apparently brushed aside by the trial judge when he found, on the basis of speculation and surmise, that Richardson was only mildly intoxicated, and, in effect, that Valium was the cause of the collision, and, therefore, Dr. Wald's prescribing Valium was the proximate cause of the collision. These findings were too speculative and unsupported by the evidence on the record as a whole to stand muster, and were plainly erroneous.

The plaintiffs argue that even if there were other proximate causes of the collision, they are still entitled to recover their damages because of the proximate cause attributed to the alleged negligence of Dr. Wald in prescribing the Valium, pointing

out that under the Alabama law there can be a recovery even though there is more than one proximate cause. While this is the rule where the plaintiff has proved that the cause he relies on was a *probable* proximate cause of the injury, or one that *actually* caused it, the rule does not apply where, as here, the plaintiffs only proved that the cause they relied on was a mere *possible* proximate cause that *might have* caused the injuries. This is especially true where there are other causes, as in the instant case, that the evidence shows were either *probable* proximate causes, or were, in combination, the *sole proximate cause* that *actually* caused the injuries, for which causes Dr. Wald was not responsible. Also, there is authority for the proposition that in a malpractice action, where there is more than one equally probable cause, for one or more of which the defendant is not responsible, the plaintiff cannot recover. See Annot., 13 A.L.R.2d 11, 22, 24, §§ 2, 3, where it is stated:

"The courts are agreed that proof of causation must go beyond a showing of a possibility that the injuries arose from the defendant's negligence or lack of skill, since the jury will not be permitted to speculate as to the causes of the injury. Thus, where the evidence considered most favorably to the plaintiff develops more than one equally probable cause, for one or more of which the defendant is not responsible, the plaintiff has failed to sustain his burden of proof."

\* \* \* \* \* \*

"II. Degree and kind of proof; general principles

§ 3. Showing of possibility; speculative proof.

In a malpractice action, proof of a possibility that the plaintiff's injuries resulted from the defendant's negligence or culpable want of skill is insufficient, and if, on the evidence, equally probable causes of injury are presented, for one or more of which the defendant is not responsible, the jury should not be permitted to guess, speculate or surmise as to the actual cause."

Again, in 61 Am.Jur.2d, Physicians, Surgeons, Etc., § 210, we find a similar statement as follows:

"The fact, however, that a physician may have been negligent is not sufficient to render him liable, and the complaining patient must prove that the injury complained of proximately resulted from such want or care or skill. *A bare possibility of such result is not sufficient.* Where there is an alleged injury which may have been due to one of several causes, any one of which may have been the sole proximate cause, it must be shown that as between the several causes, it was the physician's negligence that caused the injury. If, on the evidence, equally probable causes of injuries are presented, for one or more of which the defendant is not responsible, the jury should not be permitted to guess, speculate, or surmise as to the actual cause. *Thus, where the evidence considered most favorably to the plaintiff develops more than one equally probable cause, for one or more of which the defendant is not responsible, the plaintiff has failed to sustain his burden of proof.*" (Emphasis supplied).

In *Kuhn v. Banker*, 133 Ohio St. 304, 10 Ohio Ops. 373, 13 N.E.2d 242, 115 A.L.R. 292, the court held that where there are two or more causes which might have produced the injury, for only one of which the defendant is responsible, and where there is no evidence to show to which cause the injury is actually attributable, a verdict should be directed for the defendant, the underlying reason for the rule being that there was in such case no evidence to justify the conclusion that the injury resulted from the defendant's malpractice.

In *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R.2d 1, the court held that evidence in a malpractice action against a physician is insufficient to sustain plaintiff's burden of proving the defendant's negligence to be the proximate cause of the injury complained of, and an instructed verdict for the defendant is proper, where the evidence shows that the treatment was only a possible, as distinguished

from a probable, cause thereof, and that it was only one of several things that could have caused the injury.

Along the same line, we find the following statement in 45 Tex.Jur.2d Physicians and Other Healers § 129:

"_ _ _ [a] causal connection between a physician's alleged negligence and a plaintiff's injury cannot be presumed, nor may any inference of negligence be drawn from the fact that the results of a treatment were unfavorable. And the *plaintiff's proof* in this respect *must not only establish the defendant's act as the proximate cause, but must exclude any hypothesis as to the existence of another efficient proximate cause.* Thus, where the burden of proof is on a plaintiff to show that an injury was negligently caused by the defendant, *it is not enough to show the injury, together with expert opinion that it might have occurred from that negligence and many other causes,* since this evidence has no tendency to show that negligence did in fact cause the injury." (Emphasis supplied).

Another principle applied in malpractice cases is that the physician is not liable if negligence of the patient proximately contributed to the injury complained of. In such cases, there can be no recovery. See 70 C.J.S. Physicians and Surgeons § 51a where it is stated:

"a. In General

Where negligence on the part of the patient or those acting for him proximately contributed to the injury alleged to have arisen from the negligence or malpractice of a physician or surgeon, there can be no recovery.

"The general rules with respect to the effect of contributory negligence on the right to recover for personal injuries apply in actions for injuries alleged to have arisen from the negligence or malpractice of a physician or surgeon, and it has been uniformly held that, where negligence on the part of the patient or those acting for him proximately conduced or contributed to the injury complained of, there can be no recovery."

There can be no question but what the negligence of Richardson in the instant case proximately contributed to the injuries complained of. Actually, his negligence was the sole proximate cause of the injuries.

The following abnormal and efficient unforeseeable intervening proximate causes of the collision are found in this case for which Dr. Wald was not responsible:

(1) Richardson got drunk from drinking gin, vodka, and bourbon.
(2) While in a drunken state, he drove his car on the wrong side of the road and into the plaintiff's car.
(3) He intentionally and deliberately tried to commit suicide.

In causation cases, an act cannot be the proximate cause of an event unless that event was reasonably foreseeable by the defendant. In the instant case, Dr. Wald could not reasonably foresee in prescribing the Valium that Richardson would later get drunk and while in a drunken state try to commit suicide by driving his car head-on into the plaintiff's car or cause any other injuries. Consequently, Dr. Wald's prescription of Valium was not the proximate cause of the collision. And even if it was a *possible* proximate cause, according to the authorities listed above, there can be no recovery under the facts in this case.

In any event, in my opinion, the sole proximate cause of the collision and resulting injuries was the combined acts of Richardson in getting drunk and while in a drunken state trying to commit suicide. It should be pointed out that Richardson's attempt to commit suicide was not unusual for him. He had tried to take his own life several times before, and at times when the proof does not show that he was taking Valium. This is further proof that Valium had nothing to do with his suicidal attempt in this case.

The evidence shows that he had attempted to take his own life and had threatened to do so in the following instances. He tried to commit suicide with a rifle while in

the Air Force and a sergeant stopped him. Two years before the events in this case occurred, he threatened suicide and sought counsel from a pastor and a psychiatrist. On another occasion he swallowed broken razor blades. While in a cell at · Fort McClellan, he cut his wrist with a razor blade. At another time he had two pieces of razor blades in his mouth and later an x-ray picture showed another razor blade in his stomach which he said he ate the night before. He threatened to jump out of a window while in a psychiatric ward. Finally, he forced his wife and children to watch him for 45 minutes while he held a pistol to his head and threatened to shoot himself. As stated above, there was no evidence that he was taking Valium on these occasions. Consequently, his attempts to commit suicide in the instant case, when there was no evidence that he was taking Valium at the time, was not unusual behavior for him. He apparently had suicidal mania.

There is authority for the proposition that suicide is an abnormal efficient intervening unforeseeable cause that will bar a recovery by the plaintiff in a tort case. In *Scheffer v. Railroad Co.*, 105 U.S. (15 Otto) 249, 26 L.Ed. 1070 (1882), the Supreme Court held that where a passenger on a train was injured in a collision of the train with another train and he later became insane and committed suicide, the proximate cause of his death was his own act of self-destruction and not the negligence of the railroad, and that his suicide was a new and unexpected cause which intervened between the act which injured him and his death. The court said:

"The suicide of Scheffer was not a result naturally and reasonably to be expected from the injury received on the train. It was not the natural and probable consequence, and could not have been foreseen in the light of the circumstances attending the negligence of the officers in charge of the train.

"His insanity, as a cause of his final destruction, was as little the natural or probable result of the negligence of the railway officials, as his suicide, and each of these are casual or unexpected causes,

intervening between the act which injured him, and his death." 105 U.S. 249 at 252.

In *Salsedo v. Palmer*, 278 F. 92 (2 Cir. 1921), representatives of one Salsedo sued Palmer, Attorney General of the United States, for damages for the death of Salsedo. It appears that Salsedo was an alien and was being questioned by agents of the Department of Justice on the 14th floor of a building. The complaint alleged that such agents tortured Salsedo by such questioning so much that he became insane and jumped from a window and committed suicide. The question was one of proximate cause. The court held for the defendant, citing *Scheffer v. Railroad Co., supra*, and holding that the proximate cause of Salsedo's death was his suicide. The court said:

"*If the deceased, his mind having become unbalanced because of the treatment to which the defendants subjected him, had escaped from his confinement, and, being unable to appreciate the wrongfulness of his act, had killed the first man he met, could it be said that the death was due to the acts of the defendants? We feel certain that no liability would attach to them under such circumstances. And we feel equally certain that in taking his own life, instead of that of another, the responsibility of defendants is no different.*"

. . . . .

"We may add in conclusion that we are content to base our decision in this case solely on the authority of *Scheffer v. Railroad Company, supra*. If we may repeat what has been already pointed out in effect, in this case as in that, *the suicide was not a result naturally and reasonably to be expected from the acts of misconduct alleged to have been committed by the defendants. It was not the natural and probable consequence. His insanity* as a cause of his final destruction was as little the natural or probable result of the conduct of these defendants *as his suicide, and each of these are casual or unexpected causes intervening be-*

*tween the acts which injured him and his death."* 278 F. 99. (Emphasis supplied).

In *Lancaster v. Montesi*, 216 Tenn. 50, 390 S.W.2d 217 (1965), the mother and son of the deceased sued defendant for damages, claiming that he had tortured the deceased, his alleged paramour, by beating her, breaking her leg, burning her with cigarettes and other sadistic acts, causing her to jump from the Mississippi bridge in Memphis, Tennessee, and committing suicide. The court held that the defendant was not liable because the suicide was an efficient, intervening and unforeseeable cause that barred recovery by the plaintiffs. The court quoted from *Salsedo v. Palmer, supra,* as follows:

> " ' "An act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of the death that immediately ensues." ' *Jones v. Stewart,* 183 Tenn. 176 at 179, 191 S.W.2d 439 at 440." 390 S.W.2d 222.

The court also held:

> "We think that the facts alleged here establish an efficient, intervening, and unforeseeable cause. Thus, the proximate, or legal, cause of the harm complained of was the voluntary and free act of the deceased in taking her own life. Her voluntary act was an abnormal thing, which supersedes defendant's liability. Prosser, *supra,* sec. 49.
>
> "For these reasons, the judgment of the trial court in dismissing the action is affirmed, with costs adjudged against appellants." (Emphasis supplied). 390 S.W.2d 222.

In my opinion, the above authorities show conclusively that the attempted suicide of Richardson was a new efficient, intervening and unforeseeable proximate cause of the automobile collision in this case, and bars recovery by the plaintiffs.

I sympathize with the plaintiffs, who were injured without fault on their part. They are not to be faulted for trying to recover their damages from someone. However, the only person responsible was Richardson, who was not sued.

I feel that a serious mistake has been made and a grave injustice has been done by the judgment in this case. Dr. Wald has been convicted in *absentia* of malpractice when he was not guilty of the charge, and the Government has been saddled with judgments in the total sum of $285,790.74 for damages resulting from an automobile collision for which it was in no way responsible.

Accordingly, I would reverse the judgment of the trial court and remand the case with instructions to enter judgment for the defendant that plaintiffs take nothing by their suit.