# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00542-COA

**NED O. KRONFOL, M.D.**                                        **APPELLANT**

**v.**

**BARBARA S. JOHNSON**                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/21/2016 |
| TRIAL JUDGE: | HON. CAROL L. WHITE-RICHARD |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | R.E. PARKER JR. |
| | CLIFFORD C. WHITNEY III |
| | PENNY B. LAWSON |
| ATTORNEY FOR APPELLEE: | CHYNEE ALLEN BAILEY |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 04/30/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Barbara Johnson brought a medical malpractice suit against Dr. Ned Kronfol for injuries she suffered from an infected catheter in her dialysis port. After a trial on the matter, the jury found Dr. Ned Kronfol one-hundred percent responsible for Barbara Johnson's injuries and awarded Johnson a total of $271,000 in damages.

¶2.     Dr. Kronfol now appeals the Leflore County Circuit Court's final judgment and jury verdict. Dr. Kronfol also appeals the trial court's order denying his motion for summary judgment. Finding no error, we affirm.

**FACTS**

¶3.     In 2007, Johnson was diagnosed with kidney failure. As a result of her diagnosis, Dr. John Lucas III, a surgeon at Greenwood-Leflore Hospital (GLH) who specializes in dialysis-access surgeries, performed a surgical procedure in which he created a fistula on Johnson's right arm at her wrist. Dr. Lucas explained that a fistula is a "high-flow vein . . . close to the skin [and] connected directly to [an] artery that has a lot of flow," which allows the vein to tolerate kidney dialysis three times a week. In 2010, due to clotting issues, Dr. Lucas performed another surgical procedure, placing a fistula in Johnson's left arm at her elbow.

¶4.     From 2007 through May 2013, Johnson received dialysis through a port in her right arm, and later left arm, approximately three times a week at Fresenius Clinic. Dr. Ned Kronfol, a nephrologist who treated Johnson at the Fresenius Clinic, was in charge of her dialysis and kidney care.[1]

¶5.     On April 12, 2013, Johnson was unable to receive dialysis due to access issues with the dialysis port in her left arm. Staff members from the Fresenius Clinic referred her to GLH. Dr. Donald Russell, an interventional radiologist at GLH, attempted to perform a de-clot of Johnson's dialysis port, but he was unable to do so. Dr. Russell then placed a temporary[2] dialysis port in Johnson's internal jugular (neck) to allow her to be dialyzed. Johnson continued to receive dialysis through the temporary port in her neck.

_____

[1] Dr. Kronfol testified that he "see[s] dialysis patients once a week, either . . . [by himself] or with the help of a nurse practitioner."

[2] In the record, including the transcript, the terms "nontunneled catheter" and "temporary catheter" are used interchangeably. Similarly, the terms "tunneled catheter" and "permanent catheter" are used interchangeably. For purposes of clarity, we will use only the terms "temporary" and "permanent" to describe catheters.

2

¶6. On April 16, 2013, Dr. Lucas performed a surgical procedure on Johnson to try to restore flow in her fistula in her left arm. Dr. Lucas testified that he was not able to restore the flow to his satisfaction. As a result, Dr. Russell performed a fistulogram procedure that same day, where he attempted to open and stretch areas of Johnson's fistula. Dr. Lucas testified that this procedure was also unsuccessful.

¶7. On April 30, 2013, Dr. Lucas surgically created a new fistula for Johnson in her right arm. Dr. Lucas explained that since most fistulas require around six weeks to mature, Johnson was unable to immediately utilize that fistula.[3]

¶8. On May 6, 2013, after receiving dialysis at the Fresenius Clinic, Johnson presented to the emergency room (ER) at Delta Regional Medical Center complaining of severe pain and swelling in her face. Johnson was treated by Dr. Xander Buenafe, a nephrologist, who diagnosed her with sepsis with tachycardia arising from an infected hemodialysis[4] catheter in her internal jugular (neck). Johnson received treatment at the hospital and was released on May 15, 2013.

¶9. On August 21, 2014, Johnson filed a medical malpractice suit against Dr. Lucas and Dr. Russell, alleging negligence in their care, treatment, and usage of Johnson's hemodialysis catheter. On September 17, 2014, Johnson amended her complaint to include GLH as a

---

[3] On May 2, 2013, Johnson presented to the emergency room (ER) at Delta Regional Medical Center complaining of lower back pain caused by a displacement of a lumbar intervertebral disc. Johnson received inter-muscular (IM) injections for treatment.

[4] At trial, Dr. Orlando Gutierrez, Johnson's expert in the field of nephrology, explained that hemodialysis is performed "by retrieving the blood from the patient, having it go in through a tube, through a machine, having it basically be cleaned by the machine and extra water being taken out, and then having the blood returned to the patient."

defendant. On May 8, 2015, Johnson sent Dr. Kronfol a notice of intent to sue, and on July 8, 2015, she amended her complaint to add Dr. Kronfol as a defendant.[5]

¶10. On November 4, 2015, Dr. Kronfol filed a motion for summary judgment and argued that Johnson failed to file her medical malpractice claim within the two-year statute of limitations as prescribed by Mississippi Code Annotated section 15-1-36(2) (Rev. 2012). In his motion, Dr. Kronfol also argued that summary judgment was proper on the grounds of judicial estoppel and lack of an expert. Dr. Kronfol claimed that Johnson knew or should have known of his alleged negligence on May 6, 2013, the day Johnson was diagnosed with sepsis, because he had been her nephrologist since 2007 and had referred her to GLH, where she was seen by Dr. Lucas and Dr. Russell. Dr. Kronfol therefore argues that Johnson's May 8, 2015 notice of intent to sue and July 8, 2015 amended complaint adding Dr. Kronfol as a defendant were untimely and should be barred.

¶11. On January 20, 2016, the trial court entered an order denying Dr. Kronfol's motion for summary judgment. In its order, the trial court stated that "Johnson gave deposition testimony that she saw Dr. Kronfol or his nurses twice a week for dialysis." The trial court also acknowledged that when Johnson was asked if Dr. Kronfol sent her to GLH because his staff was having problems dialyzing her, she answered, "[y]es, that's it." However, the trial court opined that "reasonable minds can differ" as to whether Johnson's deposition testimony showed that she knew or should have known of Dr. Kronfol's alleged negligence in her injuries. The trial court explained that "[a] full reading of the deposition supports

---

[5] In October and December of 2016, Johnson voluntarily dismissed Dr. Russell, Dr. Lucas, and GLH.

[Johnson's] contention that she thought that only Dr. Lucas and Dr. Russell were involved in the installation of her temporary catheter." The trial court therefore ruled that since a genuine issue of material fact existed as to when Johnson knew of Dr. Kronfol's alleged negligence, summary judgment was improper.

¶12. A jury trial was held on December 12, 2016. After the trial, the jury returned a verdict for Johnson and awarded her $225,000 in noneconomic damages and $46,000 in economic damages. The jury found that Dr. Kronfol was 100% responsible for Johnson's injuries. The trial court entered a final judgment and jury verdict on December 21, 2016. Dr. Kronfol then timely filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, for a new trial, which the trial court denied. Dr. Kronfol now appeals.

¶13. On appeal, Dr. Kronfol asserts sixteen assignments of error, which we quote as follows:

1.   Whether the trial court erred in denying summary judgment on the statute of limitations grounds.

2.   Whether the trial court erred in failing to grant the Defendant's *Daubert*[6] challenge to Johnson's expert's reliance upon "guidelines," which were not the standard of care, were outdated and were not scientifically valid.

3.   Whether the trial court abused its discretion by allowing Johnson's expert to testify about undisclosed opinions.

4.   Whether the trial court erred in allowing a treating physician to offer expert opinions about a temporary catheter causing infection, when he was not designated to so testify.

5.   Whether the trial court erred in preventing defense counsel from

---

[6] *Daubert v. Merrell Dow Pharms. Inc*., 509 U.S. 579 (1993).

5

informing the jury that Johnson had alleged that Dr. Lucas and Dr. Russell were negligent and grossly negligent in the treatment of Johnson, which caused or contributed to her injuries.

6. Whether the trial court erred in excluding the testimony of Dr. Lucas regarding the length of time to leave a temporary catheter in place.

7. Whether the trial court erred in excluding deposition testimony of Dr. Russell, which deposition was noticed by counsel for Johnson.

8. Whether the trial court erred in allowing Johnson's counsel to cross examine witnesses and parties with statements made by other witnesses in their depositions.

9. Whether the trial court erred in not allowing into evidence the package insert of the temporary catheter used on Ms. Johnson.

10. Whether the trial court erred in sustaining Johnson's objection to Dr. Kronfol's response to a cross examination question regarding medical authorities and granting a curative instruction.

11. Whether the trial court erred in allowing into evidence a hospital bill as the proper predicate had not been laid for its for its introduction.

12. Whether the trial court erred in failing to grant Defendant's instruction on equally probable causes.

13. Whether the trial court erred in denying Dr. Kronfol's motion to summons a new jury panel.

14. Whether the trial court erroneously denied Dr. Kronfol's *Batson*[7] challenge to the all-African American jury and improperly refused to quash the jury panel.

15. Whether the trial court erred in not granting a directed verdict/JNOV for Dr. Kronfol.

16. Whether the verdict was against the overwhelming weight of the evidence, thus entitling Dr. Kronfol to a new trial.

---

[7] *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

**DISCUSSION**

I.   **Summary Judgment**

¶14.   Dr. Kronfol argues that since Johnson failed to bring her medical-malpractice claim within the two-year statute of limitations, the trial court erred in denying his motion for summary judgment.   In his appellate brief, Dr. Kronfol asserts that he was "Johnson's treating nephrologist and saw [her] at least twice per week since 2007."   Dr. Kronfol also asserts that at the very latest, Johnson possessed actual notice of her claim against Dr. Kronfol on May 6, 2013, the date that Johnson received her sepsis diagnosis.   Dr. Kronfol therefore maintains that the statute of limitations on Johnson's claim against him expired on May 6, 2015, and that as a result, Johnson's May 8, 2015 notice of intent and subsequent amended complaint were not timely filed and therefore are barred.

¶15.   As a procedural matter, the record shows that on May 8, 2015, Johnson sent Dr. Kronfol a notice of intent to sue.   On July 8, 2015, Johnson amended her complaint to add Dr. Kronfol as a defendant.   "The medical negligence statute does provide for a sixty-day tolling period once notice has been given." *Arceo v. Tolliver*, 19 So. 3d 67, 73 (¶24) (Miss. 2009) (citing Mississippi Code Annotated section 15-1-36(15)).[8]   The supreme court has held

---

[8] Section 15-1-36(15) provides, in pertinent part, as follows:

No action based upon the health care provider's professional negligence may be begun unless the defendant has been given at least sixty (60) days' prior written notice of the intention to begin the action.   No particular form of notice is required, but it shall notify the defendant of the legal basis of the claim and the type of loss sustained, including with specificity the nature of the injuries suffered.   If the notice is served within sixty (60) days prior to the expiration of the applicable statute of limitations, the time for the commencement of the action shall be extended sixty (60) days from the

7

that "whenever a plaintiff files the statutorily required sixty days of notice, the time to file an action is effectively extended by sixty days." *Scaggs v. GPCH-GP Inc.*, 931 So. 2d 1274, 1277 (¶11) (Miss. 2006). We therefore recognize that Johnson's May 8, 2015 notice of intent to sue extended the time for her to file her complaint against Dr. Kronfol by sixty days.

¶16.   Johnson denies that she knew she had a claim against Dr. Kronfol on May 6, 2013. Johnson claims that she assumed Dr. Lucas and Dr. Russell were responsible for the temporary catheter, as opposed to Dr. Kronfol. Johnson also maintains that she was diligent in seeking her medical records: she was discharged from the hospital on May 15, 2013 and requested her medical records on June 25, 2013. Johnson argues that after Dr. Russell placed her temporary catheter, she had no contact with Dr. Kronfol regarding the access point to her temporary catheter. Johnson alleges that when she saw Dr. Kronfol at the Fresenius Clinic, he never even looked at the catheter site.

¶17.   "This Court has held that appeals from the denial of a motion for summary judgment are interlocutory in nature and are rendered moot by a trial on the merits." *Franklin Collection Serv. Inc., v. Collins*, 206 So. 3d 1282, 1284 (¶8) (Miss. Ct. App. 2016) (quoting *Britton v. Am. Legion Post 058*, 19 So. 3d 83, 85 (¶7) (Miss. Ct. App. 2008)); *see also Gibson v. Wright*, 870 So. 2d 1250, 1254 (¶8) (Miss. Ct. App. 2004). However, in *Franklin Collection Services*, 206 So. 3d at 1285 (¶14) (internal quotation marks omitted), we recognized that "some federal courts of appeals have recognized an exception to this rule and will review purely legal issues decided on summary judgment even after a jury trial and

service of the notice for said health care providers and others.

8

verdict."

¶18. Turning to the case before us, Mississippi Code Section 15-1-36(1) provides that an action for medical malpractice must be brought "within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered." Miss. Code Ann. § 15-1-36(1). The supreme court has clarified that "[a]pplication of the discovery rule [in a medical-malpractice action] is a fact-intensive process." *Huss v. Gayden*, 991 So. 2d 162, 166 (¶6) (Miss. 2008). "Mississippi substantive jurisprudence requires questions of disputed fact to be decided by juries, such as when [a claimant] 'with reasonable diligence might have first known or discovered' the 'alleged act, omission, or neglect'" referenced in section 15-1-36. *Huss v. Gayden*, 991 So. 2d 162, 168 (¶10) (Miss. 2008).

¶19. In denying Dr. Kronfol's motion for summary judgment, the trial court acknowledged that "application of the discovery rule is a fact-intensive process." The trial court determined that "reasonable minds can differ as to when . . . Johnson knew of Dr. Kronfol's alleged negligence" and held that "an issue of material fact" existed. We therefore find that the issue before the trial court on summary judgment was not "purely legal." *See Franklin Collection Servs.*, 2016 So. 3d at 1286 (¶14). The record reflects that after the trial judge determined a factual question existed, the factual issue was not submitted to the jury to determine as to when Johnson knew or should have known of the alleged negligence of Dr Kronfol.

¶20. After our review, we find that the trial court's "pretrial ruling on [Dr. Kronfol's] motion for summary judgment was rendered moot by the trial on the merits. It is not

9

reviewable on appeal and therefore is not a basis for reversal." *Id*. at 1285 (¶10).

## II.    Daubert Challenge

¶21.    At trial, Dr. Orlando Gutierrez testified for Johnson as an expert in the field of nephrology.  Dr. Kronfol argues that the trial court erred in failing to grant his *Daubert* challenge to Dr. Gutierrez's reliance upon "guidelines," which were not the standard of care, were outdated, and were not scientifically valid.  At trial, Dr. Kronfol moved under Mississippi Rule of Evidence 702 and *Daubert* to strike Dr. Gutierrez's opinions relying on the National Kidney Foundation's 2006 Updates to Clinical Practice Guidelines and Recommendations ("2006 guidelines").  The trial court ultimately denied Dr. Kronfol's motion to strike, but the trial court stated that "if you have an expert or some article that states that these [guidelines] are no longer applicable or that these are no longer . . . what's used, I guess at that point it will be a question for the jury to determine whether or not what weight they want to give to it."  On appeal, Dr. Kronfol argues that Dr. Gutierrez never articulated any national standard of care for nephrologists; rather, he just articulated the recommendation "best practices" contained in 2006 guidelines.

¶22.    We review the trial court's admission or exclusion of expert testimony for an abuse of discretion. *Patterson v. Tibbs*, 60 So. 3d 742, 748 (¶19) (Miss. 2011).  "This Court should find error in the trial court's decision to exclude expert testimony only if the decision was arbitrary or clearly erroneous." *Id*.

¶23.    The supreme court has stated that "[i]n addressing *Daubert* issues, our analysis must be guided by Rule 702, which addresses the admissibility of expert testimony." *Id*. at (¶20).

10

Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b)    the testimony is based on sufficient facts or data;
> >
> > (c)    the testimony is the product of reliable principles and methods; and
> >
> > (d)    the expert has reliably applied the principles and methods to the facts of the case.

Expert witnesses must be qualified to render an opinion, and expert witnesses "should be given wide latitude when offering opinions within their expertise." *Patterson*, 630 So. 3d at 748 (¶21). "[E]xpert testimony must be relevant and reliable." *Delta Reg'l Med. Ctr. v. Taylor*, 112 So. 3d 11, 25 (¶41) (Miss. Ct. App. 2012).

¶24.    In *Daubert*, the United States Supreme Court provided factors for the trial court to consider when determining the relevance and reliability of expert testimony:

> (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; and (4) the general acceptance that the theory has garnered in the relevant expert community.

*Daubert*, 509 U.S. at 593-94. The Mississippi Supreme Court explained that "[t]hese factors are nonexclusive, and their application depends on the nature of the issue, the expert's expertise, and the subject of the testimony offered by the expert." *Patterson*, 630 So. 3d at 749 (¶21) (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 37 (Miss. 2003)).

Furthermore, "[w]hen determining whether expert testimony is admissible, our trial judges should act as gatekeepers and must determine whether the proposed testimony meets the requirements of Rule 702 and *Daubert*'s relevance and reliability prongs." *Id*. at (¶22).

¶25.   Regarding the provision in Rule 702 that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[,]" *Daubert* provides as follows:

> The subject of an expert's testimony must be "scientific knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds."

*Daubert*, 509 U.S. at 589-90. Our supreme court has also provided that "[e]xpert testimony admitted at trial must be based on scientific methods and procedures, not on unsupported speculation or subjective belief." *McKee v. Bowers Window & Door Co.*, 64 So. 3d 926, 932 (¶18) (Miss. 2011).

¶26.   In the present case, Johnson designated Dr. Gutierrez, a nephrologist, as her trial expert. In Johnson's Designation of Experts for Dr. Gutierrez, she asserted the following:

> [Dr. Gutierrez] is of the opinion that there was a breach of care in connection with the care and treatment provided to Barbara Johnson relative to the temporary catheter. Specifically, there was a breach of care [by Dr. Kronfol] when the temporary catheter was allowed to remain in place for approximately twenty-five (25) days. *Current vascular access guidelines provide that internal jugular catheters should be used for no more than seven (7) days*. See the article entitled Clinical Practice Guidelines for Vascular Access, 2006,

12

which has been previously produced.

> Dr. Gutierrez will further opine that the sepsis suffered by Barbara Johnson, her hospitalization at Delta Regional Medical Center from May 6, 2013, through May 15, 2013, and any other subsequent treatment for the sepsis were proximately caused by Barbara Johnson's retention of the internal jugular catheter for approximately twenty-five (25) days, *well beyond current vascular access guidelines*.

(Emphasis added). Dr. Gutierrez opined at trial that Dr. Kronfol breached the standard of care in his treatment of Johnson. Specifically, Dr. Gutierrez stated that Dr. Kronfol breached the standard of care by allowing Johnson's temporary catheter to be in for more than one week, which led to Johnson's infection from Methicillin-resistant *Staphylococcus aureus* (MRSA) and later sepsis. Kronfol maintains that it was inappropriate for Dr. Gutierrez to use the 2006 guidelines to set the standard of care.

¶27. At trial, Johnson's attorney asserted that the 2006 guidelines relied on by Dr. Gutierrez set forth "guidance regarding what nephrologists are supposed to do in terms of managing temporary catheters." Dr. Gutierrez informed the trial court that the guidelines were produced by a work group called The Kidney Disease Outcomes Quality Initiative (KDOQI), which was put together by the National Kidney Foundation. Dr. Gutierrez stated that the specific task of the work group "is to review the literature and determine, based upon a review of the literature, what are the best practices for different aspects of nephrology care." Dr. Gutierrez further explained during voir dire that "it's really the sort of guidelines that any nephrologist refers to in terms of understanding what is the standard of care, what is the best practice of care." Dr. Gutierrez stated that the guidelines are generally updated every five to ten years.

13

¶28. Dr. Gutierrez testified that the 2006 guidelines establish that "[t]he rate of infection for internal jugular catheters suggests they should be used for no more than one week." Dr. Gutierrez explained that he relied on the 2006 guidelines in forming his opinion, and he also stated that "this is part of the training that any minimally competent nephrologist gets in terms of how long . . . a temporary catheter should stay in for a patient on dialysis. So I'm also relying on just basic experience and training." Dr. Gutierrez further testified that the primary nephrologist generally bears the responsibility for managing catheters in patients like Johnson, who are suffering from end-stage renal disease.

¶29. In *Delta Reg'l Med. Ctr. v. Taylor*, 112 So. 3d 11, 18 (¶14) (Miss. Ct. App. 2012), Dr. Wiggins, an expert witness in the field of emergency medicine, agreed that "the American Stroke Association's (ASA) Guidelines for the Early Management of Patients with Ischemic Stroke: A Scientific Statement from the Stroke Council of the American Stroke Association," constituted "an authority for establishing the standard of care in stroke patients." Upon review, this Court found no abuse of discretion in the trial court's admission of Dr. Wiggins's expert testimony, "since [he] grounded [his] expert opinions and testimony upon [the defendant's] medical records, the methods and scientific principles taught in residency programs, and methods and principles instructed upon by medical texts . . . ." *Id*. at 28 (¶51). This Court also held that "[Dr. Wiggins's] expert opinion[] [was] supported by and consistent with medical literature, including . . . an American Stroke Association article setting forth the standards of care for stroke patients." *Id.*

¶30. Guidelines alone do not establish the standard of care. However, in the present case,

Dr. Gutierrez testified that he did not base his expert opinion solely on the 2006 guidelines—he also relied on his training and experience as a nephrologist. We therefore find the trial court did not abuse its discretion in allowing Dr. Gutierrez to testify as an expert in the field of nephrology.

### III. Undisclosed Opinions

¶31. Dr. Kronfol argues that the trial court also erred by allowing Dr. Gutierrez to testify about undisclosed opinions. Specifically, Dr. Kronfol takes issue with Dr. Gutierrez's testimony during redirect examination that a permanent catheter could be placed in the same opening where Johnson's temporary catheter had been placed and that the procedure was a "simple procedure" without risks. Dr. Kronfol objected to the testimony, arguing that Dr. Gutierrez's opinion as to this issue was not brought up in cross-examination or contained in Johnson's designation of experts. The trial court overruled Dr. Kronfol's objection. Dr. Kronfol now claims that this testimony was "egregiously prejudicial" and that such testimony countered the testimony by Dr. Lucas that there are multiple and serious risks associated with installing a temporary catheter and installing a permanent catheter in a patient like Johnson.

¶32. Mississippi Rule of Civil Procedure 26 provides as follows:

> [U]pon request from the opposing party, a party must provide the name of each expert witness it plans to call at trial along with the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

*Bailey Lumber & Supply Co. v. Robinson*, 98 So. 3d 986, 997 (¶30) (Miss. 2012) (internal quotation marks omitted) (quoting Miss. R. Civ. P. 26(b)(4)(A)(i)). The supreme court "has

15

emphasized that it is imperative for parties to disclose more than just the general subject matter on which an expert will testify." *Id*. The disclosure must be sufficient to put the opposing party "on notice of the proffered testimony and [any] new theory at trial." *Robinson v. Corr*, 188 So. 3d 560, 570 (¶30) (Miss. 2016).

¶33.    However, Johnson argues that Dr. Kronfol opened the door to questions regarding the risks involved with temporary and permanent catheters by asking Dr. Gutierrez during cross-examination whether he heard Dr. Lucas's testimony that "the risks of placing the central line, which is a permanent catheter—of rupturing the lungs, puncturing the heart or the veins or the arteries—was more risky than the patient perhaps having an infection, which was the least risk . . . ." We recognize that "[t]he scope of redirect examination, while largely within the discretion of the trial court, is limited to matters brought out during cross-examination." *McDonald v. Lemon-Mohler Ins. Agency LLC*, 183 So. 3d 118, 133 (¶52) (Miss. Ct. App. 2015). Upon review, this Court "will not disturb a trial court's ruling on matters pertaining to redirect examination unless there has been a clear abuse of discretion." *Id*.

¶34.    During redirect examination, Johnson asked Dr. Gutierrez: "What would be the procedure or would it be possible to convert that temporary catheter to a tunneled [permanent] catheter?" Dr. Kronfol objected, arguing "[T]hat's not in his designation to discuss." During a bench conference on the matter, the trial court stated that during cross-examination, Dr. Kronfol "did talk about the dangers of putting in a permanent catheter, a tunneled catheter." The trial court ultimately overruled Dr. Kronfol's objection, and the following exchange occurred during redirect:

16

[Counsel]:        You were asked about -- going back where we were, *you were asked about dangers involved in placing a central line. Do you recall that?*

[Dr. Gutierrez]:  I do.

[Counsel]:        Okay. Are those dangers always present when you're changing a temporary catheter to a tunneled catheter?

[Dr. Gutierrez]:  No.

[Counsel]:        Explain to the jury why they are not.

[Dr. Gutierrez]:  When you have a temporary catheter -- well, let me back up. When you're placing a tunneled catheter for the first time or just from anew, there is certainly risks involved with the needle going into the vein and that catheter having problems getting into the vein and causing damage. When you already have a temporary catheter in the vein, you can exchange the temporary catheter for a new one.

. . . .

[Dr. Gutierrez]:  When you have a temporary catheter, you can exchange that catheter by putting a wire through it and put in a tunneled [(permanent)] catheter in its place, which has many fewer risks involved with it than if you had to place a tunneled catheter fresh or just new.

[Counsel]:        And that would have been the procedure since Ms. Johnson already had a temporary catheter. Is that correct?

[Dr. Gutierrez]:  That's correct. It's a simple procedure.

(Emphasis added).

¶35.  After our review, we find no abuse of discretion by the trial court in allowing Dr.

Gutierrez to testify as to his opinion that through a simple procedure, a permanent catheter

could be placed in the same opening where Johnson's temporary catheter had been placed.

17

Dr. Kronfol opened the door to this line of questioning during cross-examination, and the trial court was within its discretion to allow Dr. Gutierrez to testify on the matter during redirect examination.

## IV.    Expert Opinion from a Treating Physician

¶36.    Dr. Kronfol argues that the trial court erred by allowing Johnson's treating physician, Dr. Xander Buenafe, to offer an expert opinion that the temporary catheter placed in Johnson presented a "very high risk" of infection and that the catheter was the source of the MRSA infection.  Dr. Kronfol asserts that the testimony by Dr. Buenafe about the risk of infection from a temporary catheter went well beyond his treatment of the patient and should have been excluded by the trial court.  Dr. Kronfol maintains that Johnson's expert designation of Dr. Buenafe simply states "this treating physician is expected to testify in a manner consistent with medical records," yet Johnson's medical records make no mention of the temporary catheter placing Johnson at a high risk for infection.  Dr. Kronfol further maintains that the designation does not disclose any opinion by Dr. Buenafe that the catheter caused Johnson's infection, or that Dr. Buanefe knew of the multiple shots, procedures, or frequency of dialysis that Dr. Guiterrez admitted could have precipitated the infection.

¶37.    In Johnson's designation of experts, she lists Dr. Buenafe and provides the following description:

> The physician listed below is the treating physician of [Johnson], and, as such, *is not an expert who has been retained or specifically employed to provide testimony in this matter*. This treating physician is expected to testify in a manner consistent with his medical records and reports, a copy of which has been previously provided to [Dr. Kronfol].

(Emphasis added).

¶38. The supreme court has held that "[a] physician can testify without being accepted as an expert regarding: (1) 'the facts and circumstances surrounding the care and treatment of the patient'; (2) 'what his records about the patient reveal'; and (3) 'what conditions the patient was suffering from if the opinion was acquired during the care and treatment of the patient.'" *Chaupette v. State*, 136 So. 3d 1041, 1046 (¶8) (Miss. 2014) (quoting *Griffin v. McKenney*, 877 So.2d 425, 439-40 (¶50) (Miss. Ct. App. 2003)). However, the supreme court cautioned that "a physician cannot testify about the significance of a patient's condition or industry standards without first being accepted as an expert." *Id*. (internal citations omitted); *see also* M.R.E. 701 and 702. We review "[a] trial court's admission of testimony . . . for an abuse of discretion." *Id*. at 1045 (¶7).

¶39. In response to Dr. Kronfol's argument, Johnson maintains that Dr. Buenafe's testimony regarding the temporary catheter and the high risk of infection was consistent with Johnson's medical records from her admission and treatment at Delta Regional Medical Center between May 6–15, 2013. On Johnson's discharge summary prepared by Dr. Buenafe and admitted into evidence, the discharge diagnoses states, among other things, "Bacteremia, MRSA, Catheter-related."

¶40. The disputed testimony occurred during Dr. Buenafe's direct examination:

Q: Okay. And you just testified that you took a look at the catheter?

A: Yes, ma'am.

Q: Okay. And describe for me what you saw.

19

A: It had—it had some gauze dressing on it, if I remember correctly, which was really dirty. The pus had seeped through the dressing. I can't remember the exact color, but it was probably brownish to yellow, something like that. It just struck me as being horribly dirty.

Q: And when you saw that, what did you do?

A: I took the dressing off, and then I realized it was a nontunneled [temporary] catheter.

Q: What was the significance of it being a nontunneled catheter?

A: When we were trained as nephrologists, we didn't . . . .

Dr. Kronfol then objected to Dr. Buenafe providing any opinion regarding his training and experience, which were not part of Johnson's medical records. Johnson explained that Dr. Buenafe intended to testify that he based his treatment of Johnson on the discovery that she had a temporary catheter, rather than a permanent catheter, in her arm. The trial court overruled Dr. Kronfol's objection.

¶41. Upon resuming direct examination of Dr. Buenafe, Johnson asked: "What was the significance of being a nontunneled catheter?" Dr. Buenafe answered that "[a] nontunneled catheter would place the patient at very high risk for having an infection." Dr. Buenafe testified that he made phone calls to other physicians to try and verify why Johnson had a temporary catheter in place. Dr. Buenafe stated that he was ultimately unable to find out why Johnson had a temporary catheter. Johnson asked, "Was this a significant finding for you?" Dr. Buenafe responded, "Yes. . . . As mentioned earlier, it would have put her at higher risk of infection."

¶42. Counsel for Johnson then referred Dr. Buenafe to Johnson's discharge instructions,

20

where Dr. Buenafe wrote that the culture taken from the tip of Johnson's catheter revealed that Johnson had MRSA. Johnson asked Dr. Buenafe whether he was able to determine the source of the MRSA infection, and Dr. Buenafe responded, "Presumably, the catheter. It was what we would call, I think, the most proximate cause." Dr. Buenafe testified that he did not investigate other possible causes of the infection; instead, "[w]e approached the most probable cause." Dr. Buenafe explained that "nontunneled [(temporary)] catheters are prone to resulting in such infections; so we decided to approach [Johnson's] problem starting with that."

¶43. Based on our review of the record, we find that Dr. Buenafe's testimony is consistent with Johnson's medical records and his treatment of Johnson. We find no abuse of discretion in the trial court's decision allowing Dr. Buenafe to testify that Johnson's temporary catheter presented a high risk of infection and was the source of the MRSA infection that he diagnosed in the treatment of Johnson.

### V. Alleged Negligence of Dr. Lucas and Dr. Russell

¶44. Dr. Kronfol next alleges that the trial court erred in preventing his defense counsel from informing the jury that Johnson had alleged that Dr. Lucas and Dr. Russell were negligent in their treatment of Johnson, and that their negligence caused or contributed to her injuries.

¶45. At trial, the trial court sustained Johnson's objection to any evidence or testimony about the dismissal of Dr. Lucas and Dr. Russell and Johnson's prior claims against them. Dr. Kronfol acknowledges that the jury received an apportionment instruction allowing the

21

jury to apportion liability to Drs. Lucas and Russell, but he maintains that because the trial court prohibited the jury from knowing about the admissions and allegations in the complaints against Dr. Russell and Dr. Lucas, the jury did not assess any percentage of fault against them. Dr. Kronfol cites to various authority[9] in support of his assertion that for purposes of apportionment, a defendant is entitled to present evidence that the plaintiff settled with a co-defendant against whom she also asserted fault.

¶46. Johnson, however, argues that Dr. Lucas and Dr. Russell were both voluntarily dismissed as defendants prior to trial and that no settlement offers were made or accepted in conjunction with their dismissal. Johnson maintains that the cases relied upon by Dr. Kronfol in his appellate brief involve monetary settlements, while the dismissals of Dr. Lucas and Dr. Russell were voluntary. There was no evidence offered by either party of any settlement offers or of actual settlements with Dr. Lucas or Dr. Russell.

¶47. We review a trial court's admission or exclusion of evidence for an abuse of discretion. *Gateway United Methodist Church of Gulfport v. Mississippi Transp. Comm'n*, 147 So. 3d 900, 903 (¶9) (Miss. Ct. App. 2014). "There is no abuse of discretion by the trial court in granting a motion in limine if: (1) the material or evidence in question will be inadmissible at trial under the rules of evidence; and (2) the mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury." *Id.*

___

[9] Dr. Kronfol cites to the following cases in support of his argument that the fact a plaintiff alleges negligence against a dismissed defendant is highly relevant and significant evidence for purposes of the apportionment statute: *Blailock ex rel. Blailock v. Hubbs*, 919 So. 2d 126, 131 (Miss. 2005); *Smith v. Payne*, 839 So. 2d 482, 487 (Miss. 2002), *Estate of Hunter v. Gen. Motors Corp.*, 729 So. 2d 1264, 1276 (Miss. 1999); *Robles ex rel. Robles v. Gollott & Sons Transfer & Storage Inc.*, 697 So. 2d 383, 385 (Miss. 1997).

(internal quotation mark omitted) (quoting *Ware v. Entergy Miss., Inc*., 887 So. 2d 763, 766 (¶6) (Miss. 2004). We review questions of law de novo. *Id*.

¶48.    Mississippi Code Annotated section 85-5-7(5) (Rev. 2011) states: "In actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault without regard to whether the joint tort-feasor is immune from damages." The supreme court has interpreted this statute to state that "absent tortfeasors who contributed to a plaintiff's injuries must be considered by the jury when apportioning fault." *Blailock ex rel. Blailock v. Hubbs*, 919 So. 2d 126, 131 (¶17) (Miss. 2005) (internal quotation mark omitted).

¶49.    The transcript reflects that prior to trial, the trial court heard arguments on Johnson's motion in limine objecting to any evidence or testimony about the dismissal of Dr. Lucas and Dr. Russell from the lawsuit and Johnson's claims against them. Counsel for Johnson argued:

> I'm not saying that there can't be a finger pointed in their direction, but, specifically, I'm requesting that any mention that these doctors were previously sued be excluded. I think that that would cause confusion, it would be misleading to the jury, and the probative value—there would be no probative value to that. . . . and it would certainly be prejudicial.
>
> It would cause the jury to wonder if there was some settlement or what, and there was no settlement with these defendants.
>
> So based on the fact that these defendants were parties and are no longer parties, I think that that matter, in and of itself, is a matter that should be excluded.

Counsel for Dr. Kronfol argued that the defense was entitled to ask for an apportionment verdict to apportion liability to all three of the doctors because all of the doctors were aware

23

of Johnson's temporary catheter and failed to remove it. The trial court agreed that "[a]s far as questioning [Dr. Lucas and Dr. Russell] or apportioning blame to them or pointing the finger at them as being wholly responsible, you can do that." The trial court explained, however, that Johnson's motion in limine "goes . . . directly to actually stating that there was a lawsuit originally filed against them that has since been dismissed." The trial court ultimately granted Johnson's motion "as to referring to the fact that these doctors were originally a part of the lawsuit and have since been dismissed." The trial court again clarified that Dr. Kronfol was not precluded from "pointing the finger at those doctors or even apportioning any of the [fault]."

¶50. Our review of the record reflects that Dr. Kronfol was not limited from alleging fault on the part of Dr. Lucas and Dr. Russell. Additionally, Jury Instruction C-C-5 set forth verdict forms for the jury to choose from, including the following option:

> 2A. If you find for the Plaintiff, you may use your judgement to determine who was negligent and what percentage of plaintiff's injuries were proximately caused by each person's negligence. It is within your discretion, based upon the facts and evidence presented at trial, to determine what percentage, if any, negligence should be assigned to a particular person. You are not required to assign a percentage of negligence to any particular person.

> > a. Do you find that Plaintiff's negligence contributed to her own injury?

> > Yes    No

> If your answer is yes, please fill in the percentage that you believe that the Plaintiff was responsible for her own injuries:

> > "We, the jury, find that the Plaintiff, Barbara Johnson, was negligent and is responsible for ___ % of her own injuries."

24

b.      Do you find that Dr. Ned O. Kronfol was negligent?

Yes    No

If your answer is yes, please fill in the percentage that you believe Dr. Ned O. Kronfol was responsible for the Plaintiff's injuries:

"We, the jury, find that Dr. Ned O. Kronfol was negligent and is responsible for ___ % of Plaintiff's injuries."

c.      Do you find that Dr. Russell was negligent?

Yes    No

If your answer is yes, please fill in the percentage that you believe Dr. Donald B. Russell was responsible for the Plaintiff's injuries:

"We, the jury, find that Dr. Donald B. Russell was negligent and is responsible for ___ % of Plaintiff's injuries."

d.      Do you find that Dr. Lucas was negligent?

Yes    No

If your answer is yes, please fill in the percentage that you believe Dr. John F. Lucas, III was responsible for the Plaintiff's injuries:

"We, the jury, find that Dr. John F. Lucas was negligent and is responsible for __% of Plaintiffs injuries."

(ALL of the percentages must add up to 100%. That does not mean that you have to assign a percentage of negligence to everyone involved.)[.]

¶51.   After our review, we find no abuse of discretion in the trial court's ruling to exclude any testimony or evidence that Dr. Russell and Dr. Lucas were dismissed from the lawsuit. The record shows that the jury was still allowed to consider any negligence of Dr. Russell and Dr. Lucas in rendering its decision.

**VI.    Exclusion of Dr. Lucas's Trial Testimony**

25

¶52. Dr. Kronfol asserts that the trial court erred in excluding the testimony of Dr. Lucas regarding the length of time to leave a temporary catheter in place. Dr. Kronfol argues that Johnson's counsel had questioned Dr. Lucas about catheters in his deposition and that the testimony was relevant to Dr. Gutierrez's opinions. Dr. Kronfol also maintains Dr. Lucas was Johnson's treating physician, and the issue of the temporary catheter was relevant to Dr. Lucas's treatment. Upon review, we acknowledge that the record shows that Dr. Lucas testified as a treating physician and not as an expert witness.

¶53. "The standard of review for the admission or exclusion of testimony is abuse of discretion." *Kindred v. Columbus Country Club Inc.*, 918 So. 2d 1281, 1284 (¶4) (Miss. 2005).

¶54. At trial, Johnson's attorney asked Dr. Lucas whether he and Dr. Kronfol had an understanding "regarding who was to manage . . . Johnson's catheter." Dr. Lucas responded "no," and he testified that he does not manage hemodialysis catheters. Later, Dr. Kronfol attempted to cross-examine Dr. Lucas about whether a temporary catheter that is working should be removed and replaced with a permanent catheter. Johnson objected, stating that Dr. Lucas already testified that he does not place catheters, so he would not be removing them either. The trial court asked Dr. Lucas whether he makes the decision about placing temporary catheters or removing them. Dr. Lucas responded that "if someone comes to my office and has a functioning fistula that they've been using, then I will take out a catheter, whether it's temporary or permanent, but as far as putting them in, I don't make that decision." The trial court then sustained Johnson's objection to this testimony, ruling that

26

"that's not [Dr. Lucas's] practice area. That's not what he typically does."

¶55. Dr. Kronfol then attempted to cross-examine Dr. Lucas regarding the 2006 guidelines relied upon by Dr. Gutierrez, asking, "[D]o you agree with [the guidelines] that you should take out a working temporary catheter?" Johnson objected. The trial court sustained the objection, stating, "This doctor is not a nephrologist." Dr. Kronfol later proffered the testimony of Dr. Lucas, outside of the presence of the jury, regarding the 2006 guidelines. Dr. Lucas testified that he disagreed with the statements in the 2006 guidelines mandating that it is "improper to discharge a patient with a temporary catheter on." Dr. Lucas stated that he also disagreed with the 2006 guidelines with regard to "what constitutes long term." When asked if he would criticize the decision of the radiologist or nephrologist who decided to leave in a temporary catheter until maturation of a fistula, as long as the temporary catheter was working, Dr. Lucas responded, "If that was in a reasonable time frame, which I would say would be a month to six weeks, I think that would be okay."

¶56. As stated, a treating physician who is not testifying as an expert "can testify without being accepted as an expert regarding: (1) 'the facts and circumstances surrounding the care and treatment of the patient'; (2) 'what his records about the patient reveal'; and (3) 'what conditions the patient was suffering from if the opinion was acquired during the care and treatment of the patient.'" *Chaupette*, 136 So. 3d at 1046 (¶8) (quoting *Griffin*, 877 So. 2d at 439-40 (¶50)). Dr. Lucas testified that he was a surgeon, and not a nephrologist, and he did not manage catheters.[10] Any testimony from Dr. Lucas regarding the placement and

_____

[10] *See also Langston v. Kidder*, 670 So. 2d 1, 4 (Miss.1995) (The supreme court held that it was error for a party, not designated as an expert witness, to testify to industry

removal of catheters would therefore be outside of the scope of his treatment of Johnson. We therefore find no abuse of discretion by the trial court in excluding Dr. Lucas's testimony regarding temporary catheters.

### VII.    Deposition Testimony of Dr. Russell

¶57.    Dr. Kronfol argues that the trial court erred in excluding portions of the deposition testimony of Dr. Russell, the interventional radiologist who ordered and placed Johnson's temporary catheter. The record reflects that during Dr. Russell's deposition, Johnson asked Dr. Russell about whether the temporary catheter which he installed should have been removed after no more than one week. Dr. Russell replied that it could be left in much longer than that. When Johnson asked if Dr. Russell had any support for this proposition, he cited to at least one medical article. Like the testimony of Dr. Lucas, upon review of this assignment of error, we acknowledge that the record reflects that Dr. Russell was also testifying as a treating physician and was not designated as an expert witness.

¶58.    At trial, Dr. Kronfol sought to introduce Dr. Russell's deposition testimony, and Johnson objected. The trial court sustained the objection and ruled that portions of Dr. Russell's deposition testimony were inadmissible because "he is a lay witness or a treating physician in this case and not an expert, [and] has not been designated as an expert." The trial court allowed Dr. Russell's deposition testimony, except for the portions excluded based on objections by the parties, to be read into the record as his trial testimony.

¶59.    We recognize that pursuant to Mississippi Rule of Civil Procedure 32(a)(3), "The

standards and whether the defendant met those standards.)

28

deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: (B) that the witness is at a greater distance than one hundred miles from the place of trial or hearing, or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition; or . . . (E) that the witness is a medical doctor . . . ." A treating physician "can testify without being accepted as an expert regarding: (1) 'the facts and circumstances surrounding the care and treatment of the patient'; (2) 'what his records about the patient reveal'; and (3) 'what conditions the patient was suffering from if the opinion was acquired during the care and treatment of the patient.'" *Chaupette*, 136 So. 3d at 1046 (¶8) (quoting *Griffin*, 877 So. 2d at 439-40 (¶50)) (internal citation omitted).

¶60. In *Scafidel v. Crawford*, 486 So. 2d 370, 372 (Miss. 1986), the supreme court found no error where the trial court allowed the testimony of two doctors who had treated the patient. The supreme court held:

> The question is whether these two fact witnesses crossed an impermissible line between fact testimony and expert opinion when they stated Mrs. Scafidel was anemic. We conclude they did not. Their opinions in this regard, according to their testimony, were acquired through their care and treatment of her during this illness. Just as they testified as fact witnesses that she had fever, chills, and diarrhea, so could they state, in our opinion, that she was anemic without becoming expert witnesses.

*Id*.

¶61. Johnson maintains that *Scafidel* is distinguishable from the case at hand because *Scafidel* deals with the admissibility of opinions acquired during the care and treatment of the patient. *Id*. at 372. Johnson argues that since Dr. Russell referred Johnson to Dr. Kronfol, her primary physician, for follow-up care regarding the catheter, then the opinions

29

offered by Dr. Russell regarding the appropriate length of time to retain a temporary catheter would be outside of the care and treatment he offered to Johnson.

¶62.  The record reflects that the trial court ruled that she would not allow certain testimony from Dr. Russell's deposition to be admitted into evidence, explaining that

> all of that testimony goes to his opinion regarding whether or not the temporary catheter should have been removed or whether or not it should have been replaced with a permanent catheter.  Given the fact that he is a lay witness or a treating physician in this case and not an expert, has not been designated as an expert, I'm not going to allow his opinion testimony.

The trial court did, however, allow the following deposition testimony regarding temporary catheters to be read into the record at trial:

> A:  Dr. [Michael] Ko and I do the maintenance of the fistulas and the grafts he puts in and then if they need -- most patients that need central lines and central access, for some reason we end up doing that.  Dr. Lucas may put in a few but we put in most of them.
>
> Q:  The central line would—the central line would be what in particular?
>
> A:  Central dialysis catheters.
>
> . . . .
>
> Q:  And then in terms of [placing] the temporary catheter, who made that decision?
>
> A:  He did.
>
> Q:  That was Kronfol's decision?
>
> A:  Yes.
>
> Q:  Solely?
>
> A:  Yes.  I may have suggested that as an option, you know. It's a discussion, it's not like him giving me orders to do something that I

30

> think is not indicated but, I mean, it's pretty clear to anybody that does this that this temporary catheter was indicated at this point.

> Q: Okay.

> A: He did give the directions. That's what he wanted us to do with this patient at that time is to do and send her on to the ER.

Dr. Russell also testified that on Johnson's discharge sheet for the catheter procedure, he instructed Johnson to "follow up with [her] primary physician" in two weeks. Dr. Russell clarified that Johnson's primary physician would be her nephrologist.

¶63. As stated, we review a trial court's admission or exclusion of testimony for an abuse of discretion. *Chaupette*, 136 So. 3d at 1045 (¶7). In so doing, "[w]e give great deference to the discretion of the trial judge," and we will not overturn a trial court's decision to admit or exclude testimony absent a finding that the decision was arbitrary and clearly erroneous. *Id.* "Moreover, we may reverse a case only if[] the admission or exclusion of evidence results in prejudice and harm or adversely affects a substantial right of a party." *Id.* (internal quotation mark omitted). Upon our review, we find no evidence to show that Dr. Kronfol suffered prejudice and harm or that his substantial rights were adversely affected by the trial court's exclusion of portions of Dr. Russell's deposition testimony. This issue lacks merit.

## VIII. Cross-examination by Johnson

¶64. Dr. Kronfol argues that the trial court erred in allowing Johnson to cross examine witnesses and parties with statements made by other witnesses in their depositions when those deposed witnesses were not on the stand.

### A. Dr. Gary Davis

31

¶65. Dr. Kronfol's expert witness, Dr. Gary Davis, testified as an expert in the field of nephrology with an emphasis on dialysis catheters. Dr. Kronfol argues that the trial court erred by allowing Johnson to cross-examine Dr. Davis about statements made in deposition by Dr. Russell—a witness who did not testify live—regarding Dr. Russell receiving his orders from Dr. Kronfol

¶66. Dr. Kronfol argues that the trial court misapplied Mississippi Rule of Evidence 804(b)(1) in permitting Johnson to cross-examine Dr. Davis. Dr. Kronfol asserts that the rule allows for the reading into evidence of prior testimony of an unavailable witness who has been subject to cross-examination in lieu of live testimony by that witness. However, Dr. Kronfol claims that the trial court instead allowed Johnson to attempt to impeach Dr. Davis with portions of Dr. Russell's deposition.

¶67. Mississippi Rule of Civil Procedure 32(a)(1) states, in pertinent part, as follows:

> At the trial . . . any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
>
> (1)     Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness, or for any other purpose permitted by the Mississippi Rules of Evidence.

The comments to Rule 32 states that Mississippi Rule of Evidence 804(b)(1) "permits the introduction of deposition testimony by a witness who is unavailable at trial. Although the deposition of the unavailable witness need not have been taken in the same proceeding as that in which it is offered, the party against whom the deposition testimony is being offered,

32

must have had an opportunity and similar motive to develop the testimony."

¶68.   Rule 804(b)(1) sets forth as follows:

The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:

(1)   Former Testimony. Testimony that:

(A)   was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and

(B)   is now offered against a party who had--or, in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

¶69.   At trial, the trial court allowed the following testimony during Johnson's cross-examination of Dr. Davis, despite Dr. Kronfol's objections that Dr. Russell's deposition was not in evidence:

Q.   Didn't Dr. Russell say in his deposition that he gets the orders from Dr. Kronfol and he follows them?

A.   Yes, ma'am.

Q.   Okay.  So nephrologists do tell interventional radiologists what to do, don't they?

A.   Usually what you do is you order a procedure, and how the procedure is done is dictated by the interventionalist.

Q.   But the specific procedure itself is ordered by the nephrologist?

A.   Not always

. . . .

33

Q.      So in reading [Dr. Russell's deposition testimony], what Dr. Russell indicates is simply that [Dr. Kronfol] wanted him to place a temporary catheter and send [Johnson] to Greenville. Is that correct? On this reading, is that what it says?

A.      . . . [T]hat is what the reading says. That's what Dr. Russell said.

¶70.   Both Rule 32(a)(1) and Rule 804(b)(1) permit Johnson to use Dr. Russell's deposition testimony to cross-examine Dr. Kronfol's expert witness, Dr. Davis. As stated, we review a trial court's admission or exclusion of testimony for an abuse of discretion. *Chaupette*, 136 So. 3d at 1045 (¶7). "[W]e may reverse a case only if[] the admission or exclusion of evidence results in prejudice and harm or adversely affects a substantial right of a party." *Id*. (internal quotation mark omitted). After our review, we find the trial court did not abuse her discretion in allowing Johnson to use Dr. Russell's deposition testimony to cross-examine Dr. Davis.

### B.     Dr. Kronfol

¶71.   The trial court also permitted Johnson to cross-examine Dr. Kronfol about Dr. Russell's deposition statement he instructed Johnson to follow up with Dr. Kronfol and about Dr. Russell discussing the temporary catheter with Dr. Kronfol. Dr. Kronfol objected, and the trial court overruled the objection, explaining that Mississippi Rule of Evidence 804(b)(1) "specifically accepts former testimony that was given at a deposition that's now being offered against a party who had an opportunity and similar motive to develop it by cross-examination, direct examination or redirect examination from being hearsay." The trial court also ruled that "[i]n cross-examination you can impeach a witness or cross a witness on any statement that anybody gave whether it is from the deposition or not."

34

¶72.   Dr. Kronfol maintains that Rule 804(b)(1) is limited to the use of prior testimony where it is offered against a party "who had . . . an opportunity or similar motive to develop it by direct, cross-, or redirect examination." Dr. Kronfol that he did not have a similar motive cross-examine to Dr. Russell during the November 19, 2015 deposition because at a time, Dr. Russell was a co-defendant. However, Johnson maintains that a deposition may be used against any party who was present or represented at the taking of the deposition, and counsel for Dr. Kronfol was present at Dr. Russell's deposition.

¶73.   After our review, we find that both Rule 32(a)(1) and Rule 804(b)(1) allow Johnson to use Dr. Russell's deposition testimony to cross-examine Dr. Kronfol, who is a party to the proceeding and had the opportunity to cross-examine Dr. Russell during his deposition. We therefore find no abuse of discretion by the trial court in allowing this testimony.

IX.    **Exclusion of Catheter Package Insert**

¶74.   Dr. Kronfol asserts that the trial court erred in not allowing into evidence the package insert of the temporary catheter used on Johnson. Dr. Kronfol argues that this insert was an important piece of evidence for the defense because the insert recommends that the catheter has an optimal use for four weeks, and not one week, as Dr. Gutierrez contended. Dr. Kronfol maintains that Johnson's catheter had not been in place for four weeks at the time of her hospitalization on May 6, 2013.

¶75.   We review a trial court's admission or exclusion of evidence for an abuse of discretion. *Rebelwood Apartments RP, LP v. English*, 48 So. 3d 483, 490 (¶33) (Miss. 2010).

¶76.   In her appellate brief, Johnson explains that the court reporter erroneously marked and

entered the package insert, as well as the supplemental discovery response from GLH providing the insert, as Trial Exhibit 7. Our review of the record confirms that the catheter package insert was marked as Trial Exhibit 7 and entered into evidence. We therefore find that Dr. Kronfol's argument lacks merit.

### X.     Testimony Regarding Medical Authorities

¶77.   Dr. Kronfol asserts that the trial court erred in sustaining Johnson's objection to Dr. Kronfol's response to a cross-examination question regarding medical authorities and granting a curative instruction. Dr. Kronfol argues that Rule 803(18) only requires that "a treatise used in direct examination must be disclosed to an opposing party without charge in discovery" and that the rule does not address treatises produced during cross-examination.

¶78.   "This Court applies an abuse-of-discretion standard when a trial court decides "whether a party opens the door for an opposing party to inquire about otherwise inadmissible evidence." *Robinson v. Corr*, 188 So. 3d 560, 572 (¶38) (Miss. 2016) (quoting *Hartel v. Pruett*, 998 So. 2d 979, 988 (¶22) (Miss. 2008)).

¶79.   During cross-examination of Dr. Kronfol, Johnson's counsel's asked Dr. Kronfol whether he had any medical authorities to support his opinion. Dr. Kronfol responded that he had two medical articles that he just pulled that day. Johnson objected, and the trial court sustained the objection, explaining that Dr. Kronfol cannot produce articles in response to cross examination which were not previously produced to opposing counsel:

[Counsel for Johnson]:     Your Honor, I'm going to object.

[Counsel for Dr. Kronfol]:  She asked for it.

36

| [Court]: | Sustain. |
|---|---|

. . . .

| [Court]: | Attorneys, approach. . . . [Y]ou know that he cannot produce articles that he has not produced in discovery in court today. |
|---|---|
| [Counsel for Dr. Kronfol]: | If she opens the door, which she just opened the door. Judge, he can have them here, and that's what she wanted him to say, no, I don't. And now that he says, yes, I do, she says I want to hide behind this rule, but when she opens the door, she opens the door. She took a risk and she missed. |
| [Court]: | Mr. Parker, you know that your client cannot come into this courtroom with articles today that you've not disclosed to opposing counsel. |
| [Counsel for Dr. Kronfol]: | I know I can't bring it up. Look at the rule. I know I can't bring it up on direct unless I furnished it, but on cross-examination I can and that's what she did. That's exactly what she did. |
| [Court]: | I'm gonna sustain the objection. |

¶80. At the conclusion of Dr. Kronfol's testimony, the trial court issued a curative instruction to the jury, stating:

> [Y]esterday you heard testimony from Dr. Kronfol that he had two articles with him that spoke to the amount of time that a temporary catheter should be allowed to remain in a patient. The Court instructs the jury that that testimony was improper. The testimony is stricken and should be completely disregarded by this jury and not considered in your deliberations.

¶81. Dr. Kronfol asserts that Johnson's counsel opened the door for his response. In support of his assertion, Dr. Kronfol cites to *Hartel*, 998 So. 2d at 988 (¶20), where the following exchange occurred on cross-examination of the defendant doctor by plaintiff's

37

counsel:

> Q:  I want you to cite me one article that you're relying on for that testimony which has not been provided. I want to know one article that you're citing that says Cipro alone is just as effective for diverticulitis treatment as aerobic and anaerobic coverage. You don't have one recent article that says that, do you?
>
> . . . .
>
> A:  I do have some other articles that are guides that emergency physicians go by . . . in emergency medicine. And one is an emergency medicine pediatric and adult textbook that's a reference text.

*Id.*

¶82.  Dr. Kronfol asserts that just as in the present case, in *Hartel*, the plaintiff's counsel objected that the article had not been produced in advance. *Id.* at (¶21). The supreme court affirmed the trial court's admission of the testimony and the article, holding as follows:

> Although Dr. Pruett [the defendant] did not furnish "Griffith's 5 Minute Clinical Consult" in discovery, counsel for the Hartels [the plaintiffs] "opened the door" by questioning Dr. Pruett with an open-ended challenge to "cite me one article[,]" he referenced from "Griffith's 5 Minute Clinical Consult." Once the door had been opened, the defendants were entitled to present the "otherwise inadmissible evidence" to rebut the suggestion that there were no articles to support Dr. Pruett's view.

*Id.* at (¶22).

¶83.  Similarly, in *Robinson v. Corr*, 188 So. 3d 560, 572 (¶38) (Miss. 2016), the supreme court found that the trial court did not abuse its discretion in allowing the defendant's expert witness to provide an opinion not previously disclosed in the expert designation. The supreme court explained that the expert witness "was answering questions asked by [plaintiff's] counsel" regarding the defendant's medical issue and that his "answer was

38

responsive" to the questions. *Id*.

¶84.     Furthermore, the record does not contain a proffer of what Dr. Kronfol would have testified to regarding the content of the medical authorities and Dr. Kronfol did not submit a copy of the medical authorities into evidence.  We therefore find that no harmful error occurred by the trial court excluding Dr. Kronfol's testimony regarding the medical authorities.  When a trial court refuses to allow certain evidence to be admitted at trial,

> it is incumbent on the offering party to make a proffer of the potential testimony of the witness or the point is waived for appellate review.  To preserve the excluded testimony for appeal, a proffer would have to have been made so this Court would know what testimony was excluded.  Since this matter was not properly preserved for appeal, then this issue will be treated as waived.

*Redhead v. Entergy Miss. Inc.*, 828 So. 2d 801, 808 (¶20) (Miss. Ct. App. 2001) (citation and quotation mark omitted); *see also Green v. State*, 89 So. 3d 543 (¶28) (Miss. 2012).  After considering the discretion of trial judges in the admission and exclusion of evidence, we find that if any error occurred when the trial judge excluded Dr. Kronfol's production of the two articles in responding on cross examination, that error constitutes harmless error.  *See generally Ill. Cent. R. Co. v. Brent*, 133 So. 3d 760, 779 (¶42) (Miss. 2013).

## XI.     Admission of Hospital Bill into Evidence

¶85.     Dr. Kronfol next alleges that the trial court erred in allowing Johnson's alleged hospital bill from Delta Regional Medical Center to be admitted into evidence.  Dr. Kronfol argues that the proper predicate had not been laid for the introduction of the hospital bill into evidence because Johnson never testified that she incurred or was liable for payment of these medical expenses—rather, she testified only that she got them out of her mailbox.

¶86. We review a trial court's admission or exclusion of evidence for an abuse of discretion. *Rebelwood Apartments*, 48 So. 3d at 490 (¶33). This Court has held that "[p]roof that medical, hospital, and doctor bills were paid or incurred because of any illness, disease, or injury shall be prima facie evidence that such bills so paid or incurred were necessary and reasonable." *City of Jackson v. Graham*, 226 So. 3d 608, 613 (¶19) (Miss. Ct. App. 2017) (quoting *Boggs v. Hawks*, 772 So. 2d 1082, 1085 (¶7) (Miss. Ct. App. 2000)); *see also* Miss. Code Ann. § 41-9-119 (Rev. 2013). The supreme court has set forth that "when a party takes the witness stand and exhibits bills for examination by the court and testifies that said bills were incurred as a result of the injuries complained of, they become prima facie evidence that the bills so paid or incurred were necessary and reasonable." *Id*. (quoting *Jackson v. Brumfield*, 458 So. 2d 736, 737 (Miss. 1984)). "However, the opposing party may, if desired, rebut the necessity and reasonableness of the bills by proper evidence." *Id.* "The ultimate question is then for the fact-finder to determine." *Id*.

¶87. The record reflects that during Johnson's testimony, her counsel introduced into evidence a hospital bill from Delta Regional in the sum of approximately $46,720. Dr. Kronfol objected, arguing that Johnson failed to properly lay a predicate for the admission of the hospital bill. The trial court overruled Dr. Kronfol's objection, and allowed the following testimony in relation to Johnson's hospital bill:

> Q. Is that a true and correct copy of the bill that you received from Delta Regional Medical Center?
>
> A. Yes.
>
> . . . .

40

Q.     And what is the total amount of that bill?

A.     $46,720.

Q.     Did Delta Regional Medical Center send you that bill?

A.     Yes.

Dr. Kronfol maintains that Johnson's testimony failed to set forth the predicate requirements to constitute prima facie evidence that such bills so paid or incurred were necessary and reasonable.

¶88.    Johnson argues that she properly introduced the medical bills into evidence and testified as to why she incurred the bills. The transcript reflects that at trial, Johnson testified about the treatment she received while a patient at Delta Regional; that she was diagnosed with sepsis; and that she was informed that the sepsis was caused by the temporary catheter. Johnson further testified that she was discharged from Delta Regional on May 15, 2013, and she identified the document admitted into evidence as a true and correct copy of the bill that she received from Delta Regional.

¶89.    Johnson testified at trial and submitted into evidence her hospital bill, "and testifie[d] that said bill [was] incurred as a result of the injuries complained of"; therefore, we find that such proof constitutes prima facie evidence that her medical bill was necessary and reasonable. *City of Jackson*, 226 So. 3d at 613 (¶19). Dr. Kronfol had the opportunity to then rebut the necessity and reasonableness of Johnson's bill during cross-examination. We therefore find no error in the trial court allowing Johnson to admit the medical bill into evidence.

41

## XII.   Jury Instruction on Equally Probable Causes

¶90.    Dr. Kronfol argues that the trial court erred in failing to grant his jury instruction on equally probable causes.  Dr. Kronfol cites to *Watkins v. United States*, 589 F.2d 214, 228 (5th Cir. 1979), for the proposition that "in a malpractice action, where there is more than one equally probable cause, for one or more of which the defendant is not responsible, the plaintiff cannot recover."  Dr. Kronfol asserts that all of the expert witnesses testified that the MRSA bacteria is very prevalent in hospital and dialysis settings and Johnson was frequently in such settings.  Dr. Kronfol also asserts that extensive testimony showed that it was equally probable that Johnson contracted MRSA as a result of any of the procedures performed by Drs. Russell and Lucas, or at any time dialysis procedures were performed three times a week from April 12 to May 6, or from the three inter-muscular (IM) shots she received at GLH on May 2, 2013.

¶91.    At trial, Dr. Kronfol submitted the following jury instruction, D-17, regarding equally probable causes:

> The Court instructs the jury that where the alleged injury of the Plaintiff may be attributable to one of several causes, any one of which may have been the sole proximate cause of the alleged injury, before the Plaintiff is entitled to a verdict against a Defendant it must be proven by Plaintiff by the preponderance or the greater weight of the credible evidence that, as between the several causes, Dr. Kronfol's negligence proximately caused or contributed to the alleged injuries and damages. You are not permitted by law to guess, speculate or surmise as the actual cause of Barbara S. Johnson's infection, should it appear that her infection could have been the result of one or more equally probable causes. Further, if you believe from the evidence that Barbara S. Johnson's infection could have been the result of one of several equally probable causes, any one of which may have been the sole proximate cause of the infection and that the Defendant was not responsible for one or more of said causes then it is your sworn duty to return a verdict for the Defendant Ned

42

O. Kronfol, M.D.

The record reflects that Johnson objected to jury instruction D-17, arguing that "there's been no testimony including probable causes of this MRSA infection." The trial court then refused to give instruction D-17.

¶92. We review a trial court's decision to give or refuse jury instructions for an abuse of discretion. *Byrd v. Stubbs*, 190 So. 3d 26, 30 (¶13) (Miss. Ct. App. 2016). This Court has held that "[j]ury instructions are to be read together as a whole, and a defendant is entitled to have jury instructions given which present his theory of the case." *Towles v. State*, 193 So. 3d 688, 696 (¶19) (Miss. Ct. App. 2016) (internal quotation mark omitted) (quoting *Booker v. State*, 64 So. 3d 988, 995 (¶15) (Miss. Ct. App. 2010)). "A party is entitled to a jury instruction if it concerns a genuine issue of material fact and there is credible evidence to support the instruction." *Young v. Guild*, 7 So. 3d 251, 259 (¶23) (Miss. 2009). The supreme court has clarified that "[w]hile a party is entitled to jury instructions that present his theory of the case, this entitlement is limited; the trial court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Id*.

¶93. We acknowledge that at trial, Dr. Kronfol did offer various other possible causes for Johnson's MRSA infection. However, we ultimately find that Dr. Kronfol failed to actually offer testimony or evidence showing the *equal probability* of these causes. Both Dr. Gutierrez and Dr. Buenafe testified that the temporary catheter was the source and cause of Johnson's MRSA infection and sepsis. We find no abuse of discretion in the trial court's

43

refusal to give jury instruction D-17.

### XIII.  Denial of Motion to Summons a New Jury Panel

¶94.    Dr. Kronfol argues that the trial court erred in denying his motion to summons a new

jury panel.  Dr. Kronfol claims that the trial court originally summonsed in excess of 400

potential jurors, but only 69 people actually appeared. Dr. Kronfol also claims that the circuit

clerk in this case further compounded the problem by failing to comply with Mississippi

Code Annotated section 13-5-23 (Rev. 2012), which provides as follows:

> (1) All qualified persons shall be liable to serve as jurors, unless excused by
> the court for one (1) of the following causes: (a) When the juror is ill and, on
> account of the illness, is incapable of performing jury service; (b) When the
> juror's attendance would cause undue or extreme physical or financial
> hardship to the prospective juror or a person under his or her care or
> supervision; or (c) When the potential juror is a breast-feeding mother.

¶95.    Dr. Kronfol maintains that none of the jurors excused prior to trial in this case had

submitted a certificate of a licensed physician pursuant to the statutory requirements. Dr.

Kronfol submits that the blatant disregard for the requirements of section 13-5-23 is

sufficiently extreme to requiring quashing the jury panel.  Dr. Kronfol further argues that the

clerk's excusing of jurors left Dr. Kronfol, who is Caucasian, with a totally African-

American venire in a county that is twenty-five percent Caucasian.  As a result, Dr. Kronfol

claims that since he did not have the benefit of a properly seated jury venire, he was therefore

denied a fair trial.

¶96.    We recognize that "[t]his Court may not reverse the trial judge's decisions regarding

jury selection unless there is an abuse of discretion." *Reed v. State*, 764 So. 2d 496, 499 (¶9)

(Miss. Ct. App. 2000).  Mississippi Code Annotated section 13-5-87 (Rev. 2012) states that

44

"[a]ll provisions of law in relation to the listing, drawing, summoning and empaneling juries are directory merely . . . ." In *Pulliam v. State*, 515 So. 2d 945, 948 (Miss. 1987), the supreme court explained that section 13-5-23 "does not warrant the quashing of the venire unless there is a showing of actual fraud, prejudice, or such a flagrant violation of duty as to amount to fraud."

¶97.    The record reflects that during voir dire, Dr. Kronfol moved to quash the jury panel, arguing as follows:

> [T]he jury panel list . . . shows that out of almost 400 people we only had 69 showed up.
>
> The jury information form that's done by the clerk . . . shows that over half the jury panel is African-American females, the same as the plaintiff, and that's not the percentage in the population of this county.
>
> In addition to that[,] . . . jurors that were excused prior to the trial that were not excused subject to the statute.
>
> They were giving several reasons that they had, opening their businesses, my back hurt, I have an appointment with a doctor, and the statute clearly says if they have a doctor's appointment or whatever that they must come to the court and swear that they do and have a written document from the doctor.

¶98.    In support of the motion to quash, Dr. Kronfol introduced the following exhibits: the jury summonses for this particular jury panel; the jury panel list; the jury information form prepared by the circuit clerk; and documents showing that various jurors excused prior to trial provided excuses for reasons not covered in section 13-5-87.

¶99.    After hearing arguments from both parties, the trial court denied Dr. Kronfol's motion to quash, explaining, "I don't believe that there has been any evidence that the jury panel as selected was anything but randomly selected from qualified jurors here in Leflore county."

After the jury was impaneled, Dr. Kronfol made another motion to quash the jury panel, arguing that the jury was "not representative of this population in this county or the parties that are here." The trial court denied the motion, finding that "[t]here has been no proof or nothing put before the Court to show that these jurors were not randomly selected as required by the statute and that it does not reflect the population of Leflore County."

¶100. Upon our review of the record, we find no evidence showing any "actual fraud, prejudice, or such a flagrant violation of duty as to amount to fraud" in the case before us. We therefore find the trial court did not abuse its discretion in denying Dr. Kronfol's motion to quash the jury panel.

¶101. Additionally, after reviewing Dr. Kronfol's argument that he was denied a fair trial because he had an all-African-American venire in a county that is twenty-five percent Caucasian, we find no error. Our review of the record reflects that of the sixty-nine members of the jury panel, thirteen veniremen were Caucasian, which is approximately nineteen percent of the venire.[11] "During jury selection, control and direction of the jury is generally within the discretion of the trial judge. *Billue v. State*, 64 So. 3d 589, 593 (¶13) (Miss. Ct. App. 2011). This Court has recognized that while "[d]efendants have a right to a trial before a jury selected through nondiscriminatory means, . . . the Sixth Amendment has never been held to require that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Id*. at 592 (¶9) (internal quotation mark omitted). Furthermore, "defendants are not entitled to a jury with any particular racial

_____

[11] Due to an unfortunately placed hole punch, this Court is unable to view the notation in the record reflecting Juror Number 63's race.

46

makeup.  *Id*. at 592 (¶11).  This issue lacks merit.

## XIV.  *Batson* Challenges

¶102.  Dr. Kronfol next argues that the trial court erroneously denied his *Batson*[12] challenge

to the all-African American jury without requiring race-neutral reasons.  Dr. Kronfol further

claims that the trial court erred in excusing Caucasian jurors on the basis that they knew or

respected Dr. Lucas, despite the fact that Dr. Kronfol made no objections to these jurors.  Dr.

Kronfol argues that the trial court erred in allowing Johnson to excuse all remaining

Caucasian jurors, which the court had not excused for cause.

¶103.  Johnson argues, however, that Dr. Kronfol failed to establish a pattern of Johnson

striking jurors based on race.  As a result, Dr. Kronfol failed to make a prima facie showing

that race was the criteria for the exercise of the peremptory strike, which would require

Johnson's counsel to articulate a race-neutral reason for peremptorily striking one Caucasian

member of the jury panel.

¶104.  "Peremptory strikes may not be used for the purpose of striking jurors based solely

on their race or gender."  *Lewis v. State*, 239 So. 3d 1097, 1099 (¶6) (Miss. Ct. App. 2018).

We review a trial court's ruling on a *Batson* challenge "with great deference because finding

the striking party engaged in discrimination is largely a factual finding."  *Id*. (internal

quotation mark omitted).  "The trial judge acts as finder of fact when a *Batson* issue arises."

*Allen v. State*, 235 So. 3d 168, 171 (¶7) (Miss. Ct. App. 2017). "We will not overrule a trial

court on a *Batson* ruling unless the record indicates that the ruling was clearly erroneous or

[12] *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

against the overwhelming weight of the evidence." *Id.*

¶105. In *McFarland v. State*, 707 So. 2d 166, 171 (¶13) (Miss. 1998), the supreme court held that where one party "has challenged another party's peremptory strikes on the basis of race, regardless of whether the struck jurors were black or white, the court should use the same *Batson* analysis." Dr. Kronfol asserts that upon the raising of a *Batson* challenge, the trial court should have at a minimum required Johnson to articulate a valid race-neutral reason for the exercise of her peremptory strikes. Dr. Kronfol argues that the trial court instead denied the *Batson* challenge without even requiring race neutral reasons on the record.

¶106. For the purposes of "safeguard[ing] against racial discrimination in jury selection," the United States Supreme Court set forth the following three-step process:

> First, the party objecting to the use of a peremptory strike has the burden to make a prima facie case that race was the criterion for the strike. Second, if the objecting party makes such a showing, the burden shifts to the striking party to state a race-neutral reason for the strike. Third, after the striking party offers its race-neutral explanation, the court must determine if the objecting party met its burden to prove purposeful discrimination in the exercise of the peremptory strike—that the stated reason for the strike was merely a pretext for discrimination.

*H.A.S. Elec. Contractors Inc. v. Hemphill Const. Co.*, 232 So. 3d 117, 123 (¶14) (Miss. 2016) (citing *Batson*, 476 U.S. at 89). "In order to satisfy the first step of making a prima facie case, the defendant must produce evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. If the defendant fails to make out a prima facie case showing a discriminatory purpose, the inquiry ends." *Lewis*, 239 So. 3d at 1099 (¶7) (internal quotation mark omitted). Our supreme court has articulated that when determining

48

whether a defendant has made a prima facie case that race was the criterion for the strike, "the pivotal question is whether the opponent of the strike has met the burden of showing that proponent has engaged in a pattern of strikes based on race or gender, or in other words the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Puckett v. State*, 788 So. 2d 752, 757 (¶10) (Miss. 2001) (internal quotation marks omitted) (quoting *Batson*, 476 U.S. at 94).

¶107. The record reflects that during voir dire, each person who answered that they knew Dr. Lucas was asked to approach the bench and questioned individually to ascertain the details of his/her relationship with Dr. Lucas. The trial court then struck three jurors for cause—one Caucasian female, Juror 14, and two Caucasian males, Jurors 6 and 32. Both males answered that they would take Dr. Lucas's character into consideration when evaluating his testimony. Juror 14 stated that she used to work with Dr. Lucas. When questioned by the trial court as to whether she had an opinion as to Dr. Lucas's character, Juror 14 responded "I just think he's a good doctor." The remaining jurors stated that they could be fair and impartial and would give no greater weight to Dr. Lucas's testimony than that of the other witnesses.

¶108. During the jury selection process, Dr. Kronfol raised a *Batson* challenge after Johnson's counsel used one of its peremptory strikes against a white female, Juror 8, and requested a race-neutral reason for the strike. The following exchange occurred:

[Counsel]:    I would ask a reason for excusing Number 8?

[Court]:      So are you raising a *Batson* challenge?

49

[Counsel]:       Yes.

[Court]:        And as a basis for the *Batson* challenge, what are you stating?

[Counsel]:       I'm asking her to give a race neutral reason for excusing --

[Court]:        That's not the way it goes. You make a prima facie case that she's exercised her challenges in a race based way and you do that based on a pattern if you're saying she's shown a pattern. Okay. Juror Number 8 was a white female. Juror number 9, D2, was a black female. Juror Number 22 was a black female.
            And so based on the three strikes, one was to a white female, the other were two black females, I don't believe that a pattern of racial discrimination has been shown where she has to give a race neutral reason.

¶109. Later during voir dire, Dr. Kronfol argued that Johnson's counsel was excusing only Caucasian jurors:

[Counsel for Johnson]:     Plaintiff would move to strike . . . Juror Number 26.

[Counsel for Dr. Kronfol]: Okay. Judge, that's another white female, Judge.

[Counsel for Johnson]:     White male.

[Counsel for Dr. Kronfol]: White male, I mean. The reason she didn't get all white [strikes] is because there's not enough [white veniremen] on the panel to do until she got there.

[Counsel for Johnson]:     No. The reason I didn't do all white is because I didn't need to strike more.

¶110. In *Lewis*, 239 So. 3d at 1100 (¶10), "the State had only struck two jurors, [both African-American females,] at the time of the defense's *Batson* challenge." The trial court denied the defense's *Batson* challenge after finding that the defense failed to make a prima

50

facie case establishing that the State was discriminating against members of a minority. *Id*. at 1100 (¶8). On appeal, this Court affirmed the trial court's denial of the defense's *Batson* challenge and held that "[t]he State's striking of two African–American females did not show a 'pattern' of discrimination." *Id*. at (¶10).

¶111. After our review, we find nothing in the record to indicate that the trial court's denial of Dr. Kronfol's *Batson* challenge was "clearly erroneous or against the overwhelming weight of the evidence." *Allen*, 235 So. 3d at 171 (¶7). We therefore affirm.

## XV. Sufficiency of the Evidence

¶112. A "trial court may grant a directed verdict for the defendant at the close of the plaintiff's case if, in the opinion of the court, the plaintiff has failed to present credible evidence establishing the necessary elements of his or her right to recover." *Partain v. Sta-Home Health Agency of Jackson Inc*., 904 So. 2d 1112, 1116 (¶7) (Miss. Ct. App. 2004). In determining whether a trial court erred in granting a motion for a directed verdict, "this Court must view the evidence in the same light as the trial court." *Id*. at (¶6). We review of a trial court's grant or denial of a motion for a directed verdict de novo. *Entergy Miss., Inc. v. Bolden*, 854 So. 2d 1051, 1055 (Miss. 2003).

¶113. "A motion for JNOV is a challenge to the legal sufficiency of the evidence." *Adcock v. Miss. Transp. Comm'n*, 981 So. 2d 942, 948 (¶25) (Miss. 2008). This Court will affirm a trial court's denial of a motion for JNOV "if there is substantial evidence to support the verdict." *Id.* The supreme court has explained that "[i]n deciding a motion for [a JNOV], the trial court must consider the evidence in the light most favorable to the non-moving party,

51

giving that party the benefit of all favorable inferences that reasonably may be drawn therefrom." *Solanki v. Ervin*, 21 So. 3d 552, 565 (¶35) (Miss. 2009) (citing *Corley v. Evans*, 835 So. 2d 30, 36 (¶17) (Miss. 2003)). In addition, "[t]he trial court should consider the evidence offered by the non-moving party and any uncontradicted evidence offered by the moving party." *Id*. If the evidence sufficiently supports a verdict for the non-moving party, the trial court must deny the motion for a JNOV. *Id*.

¶114. At the close of Johnson's case, Dr. Kronfol moved for a directed verdict, which the trial court denied.[13] Dr. Kronfol argues that Johnson failed to prove her claim for malpractice; as a result, he is entitled to a directed verdict or JNOV. Dr. Kronfol maintains that the evidence presented by Johnson regarding causation was legally insufficient to support a jury verdict. Both Dr. Kronfol and Dr. Davis testified at trial that there is no way to determine the source of Johnson's infection. Furthermore, Dr. Kronfol testified that he never handled Johnson's catheter access issues. At trial, Johnson admitted that Dr. Lucas and Dr. Russell handled her catheter access issues. Johnson's deposition testimony also reflects

---

[13] The supreme court has stated that "[t]o preserve the issue of denial of a directed verdict, the defense must move for directed verdict at the close of the State's case-in-chief. *Page v. State*, 990 So. 2d 760, 762 (¶9) (Miss. 2008). "If a motion for directed verdict is denied and the defendant introduces evidence on his own behalf, the defendant must renew his motion for directed verdict at the close of all evidence. *Id*. "In the absence of a renewal of the directed verdict, a request for a peremptory instruction, or a motion for a judgment notwithstanding the verdict, a defendant has waived the sufficiency error on appeal." *Woods v. State*, 242 So. 3d 47, 54 (¶26) (Miss. 2018) (quoting *Holland v. State*, 656 So. 2d 1192, 1197 (Miss. 1995)). In the present case, the record reflects that Dr. Kronfol's counsel moved for a directed verdict at the close of Johnson's case-in-chief, and the trial court denied this motion. Dr. Kronfol then presented evidence on his own behalf. At the conclusion of all evidence, Dr. Kronfol failed to renew his motion for directed verdict. Dr. Kronfol did, however, timely file his motion for a JNOV.

that she believed that because Dr. Russell placed the temporary catheter in her neck, it was his responsibility to remove it. Johnson admitted at trial that she failed to attend her follow-up appointment with Dr. Russell on April 23, 2013, nearly two weeks before her ER visit on May 6, 2013.

¶115. Johnson maintains, however, that during her case-in-chief, she presented sufficient proof of the required elements to show a prima facie case of medical negligence. A plaintiff must set forth the following elements in order to make a prima facie case of medical malpractice:

> [T]he existence of a duty on the part of the physician to conform to the specific standard of conduct, the applicable standard of care, the failure to perform to that standard, that the breach of duty by the physician was the proximate cause of the plaintiff's injury, and that damages to plaintiff have resulted.

*Estate of Northrop v. Hutto*, 9 So. 3d 381, 384 (¶9) (Miss. 2009).

¶116. In reviewing the testimony and evidence, the record reflects that at trial, Dr. Gutierrez opined that based on the 2006 guidelines, Johnson's temporary catheters should have only been used for seven days, instead of the twenty-five days her temporary catheter actually remained in. Dr. Gutierrez testified that the temporary catheter caused Johnson's infection and sepsis. Dr. Gutierrez explained that he formed this opinion based on Johnson's medical records from "the admitting physician, the tests that were done during the course of the hospitalization, and the infectious disease specialist who saw and examined [Johnson] and determined that that was the cause of the infection." Dr. Gutierrez further testified that nothing in Johnson's medical records indicated that the infection was caused by the declot procedures performed on Johnson on April 12, 2013, and April 16, 2013, or the fistulogram

53

procedure performed on April 16, 2013, or even the creation of the new fistula on April 30, 2013.

¶117. Dr. Buenafe also testified that when Johnson presented to the ER on May 6, 2013, he observed that her neck "had some gauze dressing on it, if I remember correctly, which was really dirty. The pus had seeped through the dressing. I can't remember the exact color, but it was probably brownish to yellow, something like that. It just struck me as being horribly dirty." Dr. Buenafe then removed the dressing from Johnson's neck and realized that she had a temporary catheter in her neck. Dr. Buenafe explained that a temporary catheter places a patient at a very high risk for having an infection. Dr. Buenafe testified that he immediately removed the catheter and put in a new permanent catheter. When Johnson's counsel asked if Dr. Buenafe was able to determine the course of Johnson's MRSA infection, he answered, "Presumably, the catheter. It was what we would call, I think, the most proximate cause." Dr. Buenafe admitted that he did not look into other possible causes of Johnson's MRSA infection.

¶118. Dr. Davis, Dr. Kronfol's expert witness, testified that it was within the standard of care, and an acceptable medical practice, to leave Johnson's temporary catheter in her neck until her fistula matured. Dr. Davis also provided the following testimony regarding the length of time a temporary catheter may be left in:

> There are a lot of people who have temporary catheters who are awaiting the maturation of a fistula, and I think there is one paper that states that in the United States you have somewhere in the range of 45 to 48 percent of people who are awaiting have a temporary catheter. In Europe, the percentage is much higher, and in fact, in Europe, there have been some studies where temporary catheters have been left in for three to four months and the results

have been . . . reasonably good.

¶119. Dr. Davis also disagreed with Dr. Gutierrez's opinion that the 2006 guidelines set forth the standard of care for temporary catheters. Dr. Davis explained that "[a] guideline is not a standard of care. A guideline is not a rule. A guideline is a suggestion or a recommended way of doing things. A guideline does not overrule the discretion of a physician who is there with the patient at a particular time." Dr. Davis opined that Dr. Kronfol, as well as Dr. Lucas and Dr. Russell, complied with the standard of care in their treatment of Johnson because Johnson "had a functioning vascular access." Dr. Davis stated that another choice would have been to remove Johnson's catheter and replace it with another type of catheter, but he cautioned that "infection is a risk with either type of catheter that you place."

¶120. Regarding Johnson's MRSA infection and sepsis, Dr. Davis explained that "any time that you do anything that breaks the skin, there is a risk of infection." He also stated that "[b]acteria like MRSA tend to be in hospitals." Dr. Davis testified that there is a risk of infection "every time somebody goes to dialysis . . . [or] has a catheter placed . . . [or has] any type of procedure is done where the skin is broken." Dr. Davis testified that the IM injections Johnson received on May 2, 2013, after complaining of lower back pain caused by a displacement of her lumbar intervertebral disc, could also have potentially caused her infection.

¶121. Dr. Kronfol testified that he did not handle Johnson's catheter access issues. During cross-examination, Johnson's counsel asked Dr. Kronfol about Johnson's April 12, 2013

discharge instructions from Dr. Russell regarding the placement of her temporary catheter. Specifically, Johnson's counsel asked about the instruction for Johnson to follow up with her primary physician. Dr. Kronfol explained that although he is Johnson's primary nephrologist,

> [i]t is possible that Dr. Russell intended for that to be myself or it could have been a primary physician like a family practice doctor or an internist. . . . I cannot read his mind beyond what's written. He didn't say follow up with Dr. Kronfol. He could have said follow up with Dr. Kronfol. He didn't say that.

¶122. Additionally, as stated, Johnson's attorney asked Dr. Lucas at trial whether he and Dr. Kronfol had an understanding "regarding who was to manage . . . Johnson's catheter." Dr. Lucas responded "no," and he testified that he does not manage hemodialysis catheters. Dr. Lucas testified during cross-examination that from 2007 through 2013, he provided treatment for Johnson regarding her access issues. Dr. Lucas testified that he disagreed with the statements in the 2006 guidelines mandating that it is "improper to discharge a patient with a temporary catheter on." Dr. Lucas stated that he disagreed with the 2006 guidelines with regard to "what constitutes long term." When asked if he would criticize the decision of the radiologist or nephrologist who decided to leave in a temporary catheter until maturation of a fistula, as long as the temporary catheter was working, Dr. Lucas responded, "If that was in a reasonable time frame, which I would say would be a month to six weeks, I think that would be okay."

¶123. After our review, we find that the record contained substantial evidence to support the jury's verdict in favor of Johnson. We therefore affirm the trial court's denial of Dr. Kronfol's motion for directed verdict and for JNOV.

## XVI. Weight of the Evidence

¶124. Finally, Dr. Kronfol argues that the trial court erred in denying his motion for a new trial. Dr. Kronfol asserts that the overwhelming weight of the evidence presented at trial showed that the source of Johnson's infection could not be identified, and also showed that Dr. Kronfol was not responsible for Johnson's catheter care.

¶125. "The standard of review on a motion for a new trial is abuse of discretion." *Miss. Transp. Comm'n v. United Assets LLC*, 188 So. 3d 508, 514 (¶25) (Miss. 2016). A motion for a new trial examines "[t]he weight of the evidence, rather than the legal sufficiency." *Id*. We "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Id*. To warrant the reverse of the verdict and a new trial, the defendant must show that the verdict is "contrary to the substantial weight of the evidence." *Johnson v. St. Dominics-Jackson Mem'l Hosp.*, 967 So. 2d 20, 23 (¶10) (Miss. 2007). A lesser showing by the defendant is required for a new trial than that necessary to grant a motion for JNOV. *James v. Mabus*, 574 So. 2d 596, 601 (Miss. 1990).

¶126. A new trial may also be granted "when the jury has been confused by faulty instructions, or when the jury has departed from its oath and its verdict is a result of bias, passion, and prejudice." *Dependable Abrasives Inc. v. Pierce*, 156 So. 3d 891, 895 (¶12) (Miss. 2015) (quotation omitted). We recognize that "[a] jury's verdict is given great deference by this Court, and conflicts of evidence presented at trial are to be resolved by the jury." *Johnson*, 967 So. 2d at 23 (¶10) (internal quotation mark omitted) (quoting *Lift-All*

*Co. Inc. v. Warner*, 943 So. 2d 12, 16 (¶11) (Miss. 2006)). A jury is "free to accept or reject any or all of the testimony and evidence presented." *Johnson*, 967 So. 2d at 23 (¶11).

¶127. In the present case, the jury chose to accept the testimony presented at trial that supported a verdict for Johnson. After reviewing the evidence, we cannot say that the overwhelming weight of the evidence is contrary to the jury's verdict. *See id*. We therefore find no abuse of discretion by the trial judge in denying Dr. Kronfol's motion for a new trial. A reversal of the judgment denying Johnson's motion for a new trial is not warranted.

¶128. **AFFIRMED.**

**BARNES, C.J., J. WILSON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**